## UNITED STATES *v.* JACOBSON & SONS CO. (No. 2045).[1]

1. CONSTRUCTION, PARAGRAPHS 153, 631, AND 154, TARIFF ACT OF 1913—SCRAP LEAD—SCRAP TIN—METALS UNWROUGHT—SOLDER RECLAIMED FROM SHELLS.

   Solder, reclaimed from spoiled brass shells, and consisting substantially of lead and tin in nearly equal parts, with small percentages of other metals, was imported in the shape of ingots, bars, molds, etc., to be rerun and used for various purposes. The tin content is not classifiable under paragraph 631, tariff act of 1913, as scrap tin; nor is the lead content classifiable under paragraph 153 as scrap lead. The merchandise would seem to be classifiable under paragraph 154 as "metals unwrought;" but, in the absence of any such claim in the protest, the collector's classification of it under paragraph 167 as articles or wares partly or wholly manufactured of the metals named in the paragraph must, though not approved, be undisturbed.

2. PLEADING—PRACTICE—EVIDENCE.

   A protestant is confined to the claims made in his protest.

3. EVIDENCE—PRESUMPTION FAVORS COLLECTOR.

   Where the protest makes no claim for the correct classification, that of the collector, though incorrect, must stand.

United States Court of Customs Appeals, November 23, 1920.

APPEAL from Board of United States General Appraisers, G. A. 8338 (T. D. 38398).

[Reversed.]

*Bert Hanson,* Assistant Attorney General ( *Martin T. Baldwin,* special attorney, of counsel), for the United States.

*Comstock & Washburn* ( *J. Stuart Tompkins* of counsel) for appellee.

[Oral argument Oct. 28, 1920, by Mr. Baldwin and Mr. Tompkins.]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The merchandise in this case was imported from Canada and was produced there in the following manner: So-called scrap brass, consisting of duds or spoiled shells, was purchased for the purpose, among other things, of recovering the brass therein. Solder was used in making these shells. In reclaiming the brass it would spoil the mixture if the solder was not separated from the brass, and as in the smelting operations it became liquid at a lower temperature than the brass, it was drawn off, poured into shapes and forms called ingots, bars, molds, etc., and in that condition imported. Some at least of the imported forms are cylindrical in shape, about a foot long and an inch or so in diameter.

---

[1] T. D. 38551 (38 Treas. Dec., 757).

After importation it is refined to get the impurities out, and, to use the language of one witness, is "rerun for solder or babbitt metal, or newspaper alloys, or any white alloy that would contain scrap tin and scrap lead." He further said it had to be remelted before it could be used for any purpose. His testimony, in a general way, is confirmed by the only other witness testifying.

A chemical analysis showed the two typical samples to be composed of the following percentages of the different mentioned metals:

```
Lead.......................................................... 38. 5
Copper........................................................    5
Zinc..........................................................    3
Antimony......................................................   .7
Tin........................................................... 52. 8

Lead.......................................................... 53. 8
Copper........................................................    1
Antimony...................................................... 1. 4
Tin........................................................... 43. 8
```

There is no claim or evidence of commercial designation in the case. Tin is the component material of chief value.

The importations were classified and assessed, under paragraph 167 of the tariff act of 1913, as articles or wares partly or wholly manufactured of the metals mentioned in the paragraph.

The importers claim the tin content of the importations is entitled to free entry under paragraph 631 of the act as scrap tin, and not otherwise, and that the lead content is dutiable as old scrap lead, fit only to be remanufactured under paragraph 153.

The Government concedes the assessment was erroneous, for that the merchandise can hardly be an article or ware wholly or partly manufactured, but claims it to be dutiable under paragraph 154, as "metals unwrought."

The importers agree if the classifications for which they contend are not upheld, that it should be classified under paragraph 154.

The Board of General Appraisers sustained the protest; held that the lead content was dutiable under paragraph 153, and the tin entitled to free entry as scrap tin under paragraph 631. What, if any, classification or assessment should be had as to the other metal contents it did not decide. Indeed, it did not refer thereto in any way, except to state the respective percentages of each thereof.

The Government is the appellant.

The importers' protest claims classification under paragraphs 153 and 631, and does not count on paragraph 154.

We do not see how paragraph 631 can control, because no part of the merchandise is scrap tin. If it ever was such, which may be doubted, it has passed beyond that stage, in that it has been partially manufactured, so that in the common meaning it could not be "scrap tin."

Neither is any part of it old scrap lead, fit only to be remanufactured. If it ever was, it is not now scrap lead, because it has been subjected to a manufacturing process and thereby advanced.

The fact is, the merchandise was originally a part of what might perhaps have been old brass, fit only for remanufacture, under paragraph 430, in the manufacture of which the imported article makes its first appearance as a separate entity, capable in its then condition, it is true, of being devoted to no particular use, but, nevertheless, we think, so processed that it has lost the distinctive characteristics which might make possible a classification of any components under the paragraphs claimed by importers in the protest.

This conclusion renders the question of segregation of the components of the merchandise for classification purposes of no importance, because if, as we hold, the tin content is not scrap tin, and the lead content is not old scrap lead, fit only to be remanufactured, a segregation is of no benefit to importers.

Just why the board reached the conclusion it did is not apparent from its opinion. One witness testified that the importations in reality were scrap tin and scrap lead, and the other that he called it scrap solder. The board may have concluded it ought to adopt one of these definitions. There was, however, as already stated, no effort to prove commercial designation. The question would be, therefore, whether in common understanding the merchandise was what the witnesses defined it to be, and whether so or not was for the board and is for this court, and not the witnesses, to determine.

The undisputed evidence precludes the conclusion that it is scrap of any kind, and the analyses show it to be something more than tin and lead.

It appears that under preceding tariff acts, as well as the one now in force, analogous metallic compounds have been classified as metals unwrought under paragraph 154. See T. D. 28909 (G. A. 6746), T. D. 30547 (Abstract 23116), T. D. 32333 (Abstract 27925), T. D. 38251 (G. A. 8315).

In view of these decisions, the facts in the case, and the Government's concession, as well as the claim of the importers, if the merchandise is not classifiable under paragraphs 631 and 153, it would seem that it ought to have been classified under paragraph 154 as a metal unwrought.

To so direct, however, we are powerless, and importers must rely for relief upon the good graces of the customs officials, because that claim is not made in the protest, which, as already pointed out, is limited to paragraphs 631 and 153.

It is familiar law that importer is confined to the claim made in his protest. United States *v.* Troy Laundry Machinery Co. (5 Ct. Cust. Appls., 430; T. D. 34947).

While we are satisfied that the collector's classification was wrong, importers have not established that those claimed in the protest are correct.

All we can do, therefore, is to reverse the judgment of the Board of General Appraisers, without approving the action of the collector, and accordingly the judgment below is *reversed*.