HARSHAW, FULLER & GOODWIN CO. *v.* UNITED STATES (No. 2037).[1]

1. "MINERALS, CRUDE"—PARAGRAPH 549, TARIFF ACT OF 1913—"ANTIMONY, CRUDE."

Merchandise, known commercially as "antimony crude," which is impure antimony that has been separated from its ore by liquation, is not classifiable under paragraph 549, tariff act of 1913, as "Minerals, crude, or not advanced in value or condition by refining or grinding," since the liquation has refined the mineral or ore pro tanto.

2. PARAGRAPHS 144 AND 396, TARIFF ACT OF 1913—ANTIMONY AS METAL AND AS ORE.

It was the intention of Congress to relate paragraph 144, tariff act of 1913, to antimony as *metal* in a more or less pure form and paragraph 396 to antimony as *ore.*

3. PARAGRAPH 396, TARIFF ACT OF 1913—"STIBNITE."

The provision of paragraph 396, tariff act of 1913, for "Stibnite containing antimony," describes a natural product called an ore, and does not include a product derived from an ore by liquation. The paragraph does not embrace any product of an ore.

4. LIQUATION—SMELTING.

Liquation, i. e., the extraction of a metal from its ore by heating the ore enough to fuse the metal but not enough to fuse the other contents, is a smelting operation.

5. "ANTIMONY CRUDE"—"MATTE"—PARAGRAPH 144, TARIFF ACT OF 1913.

"Antimony crude," an impure antimony derived from the ore by liquation, is a "matte" within the meaning of that expression in paragraph 144, tariff act of 1913, and is not classifiable under paragraph 396 as "antimony ore" or "stibnite containing antimony."

United States Court of Customs Appeals, February 17, 1921.

APPEAL from Board of United States General Appraisers, G. A. 8333 (T. D. 38370).

[Affirmed.]

*Brooks & Brooks* (*Frederick W. Brooks, jr.*, and *Ernest F. A. Place* of counsel) for appellant.

*Bert Hanson,* Assistant Attorney General (*Martin T. Baldwin,* special attorney, of counsel), for the United States.

---

[1] T. D. 38634.

[Oral argument Jan. 21, 1921, by Mr Place and Mr Baldwin ]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

Several importations of a commodity shown by the testimony herein to be usually referred to and known as "antimony crude" are the subjects of this appeal. The representative merchandise constituently is:

|                              | Per cent. |
|------------------------------|-----------|
| Antimony                     | 70.3      |
| Sulphur                      | 21.2      |
| Iron                         | 1.14      |
| Silica                       | Trace.    |
| Oxygen (by difference)       | 7.36      |

The importations are from China and are produced chiefly in the district along the Yangtse and in the Province of Hunan. The appeal comes up from the port of New York. The merchandise was rated for dutiable purposes by the collector at that port as "matte containing antimony but not containing more than 10 per cent of lead," under the provisions of paragraph 144 of the tariff act of 1913. The importers maintain by protest of said decision of the collector that the merchandise is entitled to free entry as "stibnite," under the provisions of paragraph 396, or as "Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture," under the provisions of paragraph 549, the latter two being paragraphs of the free list of said act. Those provisions will hereinafter be quoted more apposite with the considerations had thereof.

The method of production of the imported materials and their uses are exemplified by the record. The issue in the case is a narrow but important one, and it may well be stated before reviewing the record and authorities illuminative thereof. The case ultimately turns upon the point of whether "liquation" or "eliquation," which are coextensive words, a metallurgical process, is a smelting process; and supplementary thereof, whether or not the application of the process of liquation to antimony ore produces a "matte" within the employment of that term in said paragraph 144.

It may be said of the testimony in the present record that when fairly viewed in detail of expression it does not in any important particular differ from either the lexicographical or scientific authorities, save as to the determinative point of difference between the witnesses in the record as to whether or not *liquation* is a *smelting* process.

The importers produced, among others, Mr. Arthur L. Stark, vice president and superintendent of the importing company, appellant. Mr. Stark testified as to his complete familiarity with the production of the particular class of materials here imported. He defined "liquation" as " a process of separating a more fusible from a less

fusible constituent of a mixture of metals." He testified that all forms of liquation are essentially the same; that the process actually applied in the liquation of antimony ore is that "natural ore is placed in a crucible-shaped receptacle with a hole in the bottom of it, below which is situated a crucible; heat is applied, a sulphide of antimony is fused and flows away from the gangue into the lower crucible; the material is then poured into molds and is the material which comes into the market as 'antimony crudum.'" He admitted that liquation produced a more clarified content, as follows:

Q. What is the object of that liquation process?—A. The object of the operation is the removal of gangue impurities that occur in the ore, also to avoid the shipping of so much valueless material.

Q. And by that process the gangue or rock or waste materials are separated?—A. Are left at the point of origination and not shipped.

He further testified that it was, after fusion, permitted to cool and solidify, broken up and shipped, in which condition it was imported into this country, and defined a "matte," as follows:

Q. What is a matte scientifically?—A . A matte is a product of a smelting operation containing a metallic element, a sulphide, and various other impurities.

Q. What is the smelting operation by which a matte is produced?—A. A smelting operation is one in which all the ingredients submitted to treatment are reduced to a liquid form by the addition of various fluxes to make them into fusible compounds.

Q. How does that differ from the liquation process?—A. In a liquation process only one of the constituents is reduced to a liquid form, the others remaining in solid form, as they are fusible only at higher temperatures.

The pertinent legal conspectus, said paragraphs 144, 396, and 549, may be quoted, as follows:

144. Antimony, as regulus or metal, and matte containing antimony but not containing more than 10 per centum of lead, 10 per cent ad valorem; * * *.

396. Antimony ore and stibnite containing antimony, but only as to the antimony content.

549. Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for in this section.

The above described process of the production of the imported material by melting and separation so that a pro tanto refined or purified article is produced and imported would seem to preclude the applicability of paragraph 549, and in that view further consideration of that claim by protestants is not had.

The applicable paragraphs, therefore, the competing terms of which are here pertinent, are paragraphs 144 and 396. The context of the two paragraphs read together affords much light as to the intention of Congress therein expressed. Obviously therefrom is deduced the intention of Congress to relate paragraph 144 to the antimony *metal* in a more or less pure form, and paragraph 396 to the antimony *ore* from which the antimony metal, in the form of a pure metal or regulus or in the well-known form of matte, is produced.

These observations are pertinent to the controverted question much discussed in the briefs as to the meaning of the word "stibnite" as occurring in paragraph 396. It is contended by counsel for the appellants that as used in paragraph 396 stibnite refers to materials, such as these importations, which are a liquated product from antimony ore. The Government contends that the word "stibnite" as used in paragraph 396 refers to an *ore* and not the liquated product from an ore, and that it is used as coextensive with the words "antimony ore" preceding in the paragraph. The court is of the opinion, aside from other considerations hereinafter expressed, that the phrase in paragraph 396 "stibnite containing antimony, but only as to the antimony content," intrinsically connotes that it was by Congress used as descriptive of the natural product called an "ore," and not of the liquated product from an ore. In that sense it is used coextensively in the paragraph with "antimony ore." Congress speaks in the statute of "stibnite having an antimony content," which is a relative expression, for there could be no stibnite having an antimony content unless there were in that stibnite contents other than antimony, which combined substances are by Congress designated as "antimony ore" or coextensively therewith "stibnite." The record lexicographic and scientific authorities confirm this view.

Thus the witness, Mr. Arthur L. Stark, for the importers, testified:

Q. Have you ever seen a document in any commercial transaction in this country which referred to merchandise of this kind as antimony ore?—A. Yes, sir.

Q. You mean specifically using that very expression?—A. Occasionally, but *generally it is referred to as antimony crudum.*

Q. You have never seen it invoiced as stibnite, just plain stibnite without any other expression?—A. I don't think I ever have on an invoice.

Q. Has it been called liquated stibnite?—A. No, usually antimony crudum.

Q. Liquated antimony, is that a term you have ever known to be used in business transactions?—A. No, not commercially.

Q. Then as a matter of fact as far as your experience has gone in observing the correspondence and documents connected with the purchase or sale, the usual name for it is antimony crudum, and that is the only commercial name with which you are familiar?—A. That is the most general one; it is sometimes spoken of as needle antimony; that will be spoken of occasionally, but principally antimony crudum.

Q. Never as stibnite?—A. *Stibnite is more of a mineralogical name, that is not used commercially.*

Q. Has it ever been used at all in describing this merchandise, the word stibnite?— A. At the head of document you mean, I have never seen it.

Q. As a name for this merchandise you have never seen it?—A. Not written on an invoice, no, sir.

Q. Well, have you ever in any commercial transaction that you recall heard of it referred to as stibnite, as compared with the expression—showing it was a product of a stibnite?—A. Oh, in letters I have, yes.

Q. What sort of letters are you talking about?—A. Letters pertaining to antimony; I have had a great deal of correspondence with people in this country about this material.

Q. In connection with any sales made by you of this merchandise?—A. Not in connection with the imported, sales from abroad, no.

Q. But in your purchases has there ever been anything indicating that this was commercially known by the word stibnite?—A. *No; no more than if you would say that you bought iron ore under some of the geological names, or mineralogical names they do not do it; they have certain names for it.*

Q. Speaking as a metallurgist stibnite is an ore?—A. It is.

Q. And it occurs in nature?—A. It does.

Q. It is the common ore in which antimony is found?—A. It is.

Q. *And when you use the word stibnite that is synonymous with saying antimony ore, isn't it?*—A. *It means one kind of antimony ore; it is the sulphide ore.*

Q. *It is the sulphide ore of antimony?*—A Absolutely; it don't mean the oxide ore.

Q. *There is an ore in which antimony occurs in nature as an oxide?*—A. *There is.*

Q. *That is not a stibnite?*—A. *Not what we are talking about now, no.* (Italics ours.)

## Mr. Clement J. Breen, a witness for the importers, testified:

Q. In your testimony with regard to this sample which you looked at, Exhibit 2, you were referring to a substance you handle containing approximately 70 per cent of antimony, 20 or a little over of sulphur, and 1 or 2 per cent of iron?—A. We are not interested in any other content but the antimony content.

Q. Well, in your testimony as to this product you were referring to a substance containing about 70 per cent of antimony?—A. About 70 per cent; yes.

Q. Looking like this sample?—A. Looking like that.

Q. Have you ever known that to be bought or sold in this country as antimony ore, making use of that term?—A. No; I do not recollect it.

Q. Or as stibnite?—A. No.

## Mr. J. C. Bruce, for the importers, testified as follows:

Q. You have seen the natural stibnite as mined from the earth?—A. Yes, indeed.

Q. How, if at all, does that differ in its physical characteristics from this merchandise?

\*   \*   \*   \*   \*   \*   \*

A. Natural stibnite contains impurities, principally silica, which have been eliminated from this product.

Q. Are there any physical differences in the way of structure?—A. Yes; *stibnite as mined is an ore of a dark bluish color,* while this is crystalline, in the form of needles or crystals.

Q. Have you ever handled any natural stibnite which contained 6 or 7 per cent of oxygen?—A. Yes.

Q. What are the chief differences between that merchandise and this, as you have observed it?—A. Well, in this needle antimony all impurities have been eliminated—silica and oxygen and traces of arsenic.

Mr. Bruce further testified that needle antimony, such as these importations, was used in this country for making antimony oxide; lead sulphureted antimony; that it is used in the rubber business; in glass making; in the manufacture of mordants; in the manufacture of explosives and fireworks; as a medicine in tartar emetic; and that in the condition of these importations it was ready for use in the arts.

Mr. Claude Boussand, called as a witness for the Government, stated that he was a director of the Antimony & Compounds Co., at New Brunswick, N. J., and testified as follows:

Q. Are you familiar with the production of these metals from the original ore as it comes from the ground?—A. Yes, sir.

Q. Will you describe a little bit more in detail just what business you are engaged in now at your mill?—A. I am manufacturing antimony from some kind of ore called stibnite, and I am manufacturing out of that same ore some needle antimony.

Q. The ore that you named was stibnite?—A. Yes, sir; absolutely.

## Mr. Edward Keller, for the importers, testified in like effect:

Q. Have you seen the native material and also the antimony crudum?—A. I have.

Q. And they have various kinds of the native material, differing in appearance, etc.?—A. Native materials differ greatly among themselves, according to their origin.

Q. And you have seen these different native materials in their different aspects?— A. I have.

Q. Please look at the official exhibit in this case, Exhibit 2. Are you familiar with that?—A. Yes; I am familiar with this material.

Q. What is that?—A. I call that sulphide of antimony, or stibnite.

Q. *Do you know how that is obtained?*—A. *That is obtained by the liquation process.*

Q. *From antimony ore?*—A. *From antimony—that is, from stibnite ore.*

Q. *Is stibnite ore one of the kinds of antimony ore?*—A. *It is simply one of the varieties of antimony ore.*

Q. Is stibnite ore a sulphide ore, or is it another kind of an ore?—A. Stibnite ore is a sulphide ore.

Q. *It must be a sulphide ore in order to be a stibnite ore?*—A. *It must be.* (Italics ours.)

\*      \*      \*      \*      \*      \*      \*

Q. Now, is this material stibnite in that condition you see it there, Exhibit 2?— A. Yes.

Q. Why do you say that?—A. Because it is simply melted; the ore has simply been melted; the stibnite has been melted, and it is; it is recovered in this shape. *This is simply worked stibnite.* (Italics ours.)

The views of these witnesses are fully corroborated by the lexicographic and scientific definitions of stibnite.

Thus the New Standard Dictionary, 1916, gives the following definition:

*Stibnite.*—A metallic bluish steel-gray antimony sulphid \* \* \*, crystallizing in the orthorhombic system; *the most important ore of antimony.* (Italics ours.)

## Webster's New International Dictionary, 1916:

*Stibnite.*—*Native* antimony trisulphide, \* \* \*.

## The Century Dictionary and Cyclopedia, 1911:

*Stibnite.*—*Native* antimony trisulphid \* \* \* , a mineral usually occurring in orthorhombic crystals, sometimes of great size, often acicular, and also massive. \* \* \* *This ore is the source of most of the antimony of commerce.* \* \* \* (Italics ours.)

So in Thorpe's Dictionary of Applied Chemistry, 1913, it is defined as:

*Stibnite.*—*Native* antimony sulphide, \* \* \* , *of importance as an ore of antimony.* (Italics ours.)

In harmony with the textual instruction from the language of Congress, the testimony of the witnesses in this case and the authori-

ties cited, it will be seen from the foregoing, are convincing that paragraph 396, supra, of the free list is intended to and does grant free entry to an "ore" or "ores" and not to any product from such ore.

An "ore" is commonly understood, as defined in the New Standard Dictionary, 1916, as follows:

Ore.—1. *A natural* substance, sometimes forming part of a rock, containing one or more metals. The term is applied usually to a mineral from which the metal can be profitably extracted, but is sometimes extended also to nonmetallic minerals; as sulphur ore.

Webster's New International Dictionary, 1916, defines ore as:

Ore.—1. (a) A *native* compound containing one or more metals; sometimes, also, a *native* metal or even a valuable *native* nonmetal, as sulphur. (b) *Mining.* Any material containing valuable metallic constituents for the sake of which it is mined and worked; * * * The term *ore* has usually been applied, among miners, to the crude material obtained without other than hand sorting of the lumps; but where mechanical concentration is *practiced at the mine* the concentrates are often called *ore.* * * *

Obviously, if the pure metal were taken from the mine, as ofttimes occurs in pocket mines of gold, the term "ore" might be applied to this natural product of the mine. That question, however, does not enter here. Concededly these importations are not the *natural* product of the mine.

The descriptive language of Congress in paragraph 396 modifying the term "stibnite" seems conclusive of the intent of Congress and indicative of the class of ore for which Congress intended thereby to permit free entry. It is that ore and that stibnite having an antimony content. There can be no antimony content without the presence of materials other than antimony content. Wherefore, it is apparent that the classes of ore contemplated by that paragraph were such as are usually referred to as including the gangue or other product of the mine in its natural state. This merchandise therefore is neither an "ore" nor "stibnite" as those terms are used in paragraph 396.

It is conceded that these importations are not "antimony as regulus or metal" within the terms of said paragraph 144.

The question for decision, therefore, and the one here urged by counsel is whether or not this material as imported is a "matte." It is contended by the appellants that these importations are not *matte* for the reason that they are products of the liquation process alone, while "matte" is the result of a smelting process. The contention is that liquation is not a smelting process. Perhaps no better definition of "matte" could be had than that given by the witness Stark, for the importers. He defined a matte as follows:

Q. What is a matte scientifically?—A. A matte is a product of a smelting operation containing a metallic element, a sulphide, and various other impurities.

The New Standard Dictionary, 1916, is to the same effect:

*Matte.*—An impure metallic product containing sulphur; obtained in the smelting of the sulfids of different metals, especially copper.   *   *   *

Webster's New International Dictionary, 1916:

*Matte.*—A product obtained in smelting sulphide ores of certain metals, as copper, lead, or nickel.   It is crude metal combined with more or less sulphur, and requires to be further purified.   *   *   *

It appears from the foregoing that "matte" is the result of a *smelting* process, wherefore the question arises that is here contested, whether or not *liquation* is a smelting process.

The court is of the opinion that it is.

In logic and good sense there would seem to be no reason why the melting or separation by melting of a single metal from a mass, at one time, should not be equally within the understanding of "smelting" as the melting or separation by melting of all of the metals in that mass at one time.   Smelting is essentially melting or fusing. In principle it is difficult to understand why the melting out of one metal from a mass is not equally a smelting.   Indeed, in all smelting, and in the different processes thereof, where all the contained metals are fused, each fuses at a different time and temperature.   Where the well-known and conceded results are a matte, the contents that are driven off and the contents that are included in the matte have usually suffered complete fusion or boiling at different points of temperature, and, expressing different affinities, accordingly run off in different associations and receptacles.

The witnesses for the importers in this record, while contending that liquation was not a smelting process, at times employed phrases in testifying that indicated that it is so considered.   The witness Stark, aforesaid, at page 26 thus testified:

Q. Is the liquation process a smelting process?—   A.   *   *   *   It is not.

Q. And why not?—A. Because it only reduces one of the substances to a liquid state; it does not involve any chemical change as a direct result, only the chemical change that is incidental to heating any substance; it *is the smelting away of one of the products from the gangue rock.*   (Italics ours.)

So the witness Keller, after testifying that he had recovered antimony single and in combination with lead, testified:

Q. Was that a matter of laboratory experiment or a matter of commercial practice?— A. *That was technically worked out and practiced in the smelters.*   (Italics ours.)

Thus the New Standard Dictionary, 1916, defines smelting, as follows:

*Smelting.*—   *   *   *   *differential smelting,* a method of smelting, by which certain substances in the charge are removed while others remain unfused, as iron, titanium, and silicon from bauxite, leaving the alumina unfused.   *   *   *

The Century Dictionary and Cyclopedia, 1911:

*Smelt.*— * * * To fuse, melt; specifically, to treat (ore) in the large way and chiefly in a furnace or by the aid of heat, for the purpose of separating the contained metal. Metallurgical operations carried on in the moist way, as the amalgamation of gold and silver ores in pans, treatment by lixiviation, etc., are not generally designated by the term *smelting*. Establishments where this is done are more commonly called mills or reduction works, and those in which iron is smelted are usually designated as blast-furnaces. The various *smelting operations* differ greatly from each other, according to the nature of the combination operated on. Simple ores, like galena, require only a very simple series of operations, which are essentially continuous in one and the same furnace; more complicated combinations, like the mixtures of various cupriferous ores smelted at Swansea by the English method, require several successive operations, entirely disconnected from each other, and performed in different furnaces. In the most general way, the essential order of succession of the various processes by which the sulphureted ores (and most ores are sulphurets) are treated, is as follows: (1) Calcination or roasting, to oxidize and get rid (as far as possible) of the sulphur; (2) reduction of the metal contained in the oxidized combinations obtained; (3) refining, or getting rid of the last traces of deleterious metals associated in the ores with the useful metal, to obtain which is the essential object of the operation.

Webster's New International Dictionary, 1916:

*Smelt.*— * * * To melt or fuse, as ore, to separate and refine the metal; hence, to reduce; to refine; to flux or scorify; as, to *smelt* tin.

So Hofman, General Metallurgy, 1913, Chapter VIII, on Pyrometallurgical Processes and Apparatus, page 432, states:

*Smelting in general.*—Smelting is a pyrochemical process for the extraction of *a metal* or *metallic compound* from an ore carried on at melting temperature. * * *

And it is said in Wagner's Chemical Technology, 1904, at page 203, wherein "extraction" of antimony is discussed:

Antimony is chiefly obtained by fusion followed by desulphurizing. The *smelting* is effected in some districts * * * in crucibles, * * *. The eliquation of antimony sulphide can be effected most rapidly when the ore * * *, *is placed directly upon the sloping hearth of a reverberatory* and care is taken that the antimony sulphide, as it melts out of the ores, flows from the lowest point of the hearth through the channel to a receiver placed outside the furnace. (Italics ours.)

Thus in Spon's Dictionary of Engineering, 1874, Vol. I, p. 111, under antimony, it is stated :

The *smelting operation* is in some instances divided into two manipulations; *the one, or first, is a process of liquefaction*, in which the crude antimony is melted in vertical pipes, and thus separated from the gangue, which remains in the retort while the former filtrates through the perforated bottom. (Italics ours.)

Hofman's General Metallurgy, 1913, Chapter VIII, at page 501, treats of liquating under Pyrometallurgical Processes and Apparatus; at page 433 of the same volume, same chapter, it is stated:

Smelting processes in general are either mainly *reducing* or mainly oxidizing. *The metal-bearing product of a reducing fusion is usually an impure metal, such as pig iron, pig tin; it may be a metallic sulphide called matte; as with sulphide ores;* or an arsenide called speise, as with arsenical nickel ores; sometimes all three classes of products are

formed in a single fusion, as with mixed Pb, Cu, Ni ores containing S and As. The aim of an oxidizing fusion is (1) to remove impurities contained in metal, as in the conversion of pig iron into steel or wrought iron; the refining of copper, the separation of lead and silver; or (2) to decompose a matte or a speise and thus recover the metals with which the S, or the As, was combined; or (3) to smelt a sulphide ore for matte (pyritic smelting).

Wagner's Chemical Technology, 1904 (p. 203), in speaking of the extraction or reduction of antimony by "fusion followed by desulphurizing," refers to the process as smelting and accompanies this with a description of the liquation methods.

This court in United States v. Jacobson & Sons Co. (10 Ct. Cust. Appls., 191; T. D. 38551), in speaking of the liquation of certain solder material from scrap metal incidentally refers to that process as one of the smelting operations.

Some stress seems to have been laid by the opponents of this proposition upon the fact that in the smelting of antimony by the liquation process no fluxes were needed or added. It is contended that a smelting process is one that necessarily employs the use of fluxes in the making of a matte. This question seems to have been answered by the decision of the United States Circuit Court of Appeals, Sixth Circuit, in the unusually well considered case of Cowles Electric Smelting & Aluminum Co. et al. v. Lowrey (79 Fed., 331). The opinion is by Judge Severens, concurred in by Mr. Justice Lurton and Judge Hammond. The point therein was whether or not the fusion of metals by an electrical process could be deemed smelting in that no fluxes were therein employed. The court at page 343 stated:

The term "electric" sufficiently distinguished it from the older method, for in itself it carried the idea of fusing and electrolyzing, both being its well-known functions. *Because a different agency was employed to effect one of the things done in the operation would not alter the general character of the whole process, to which the comprehensive characterizing of "smelting" in the sense of "reduction" would fitly be applied.* (Italics ours.)

That doctrine in principle is clearly applicable to this case. Smelting is a sufficiently comprehensive characterization in the sense of *reduction* to include all reductions of ores whether one or more of its metals or contents were the object or result of the fusion. Certainly smelting refers to a process. It is a melting or fusing process, and whether or not the result of that process is a fusing or melting of one or more metals, the result obtained does not change the character of the applied process. It is a smelting process whether it produces by fusion one or more fused results.

The court is of the opinion, therefore, that the liquation process may well be deemed and is a smelting process. This smelting process or operation having produced a product "containing a metallic element, a sulphide and various other impurities," this imported article under all definitions of that term and according even to the

definition of importers' chief witness, Mr. Stark, is a matte. It is unimportant that it is known commercially or commonly as a matte so long as it is within the known descriptive force of that word. It is fully within the power of Congress to use a descriptive term as indicative of a subject matter of commerce, the meaning of which is ascertainable. It is unnecessary, therefore, that there may be in trade and commerce an article commonly or commercially known as antimony matte, it having been shown that the imported article is, in fact, produced and constituted like a matte, as that term is commonly understood, and that the imported material in other particulars complies with the descriptive language employed by Congress.

The court is of the opinion, therefore, that the imported material is descriptively well within the meaning of the term "matte;" that it contains antimony and that it contains less than 10 per cent of lead; wherefore, it is within that descriptive phrase employed by Congress in said paragraph 144.

*Affirmed.*