(C. D. 1678)

C. J. Tower & Sons *v.* United States

United States Customs Court, Second Division

(Decided February 3, 1955)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Arthur R. Martoccia* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; FORD, J., dissenting

LAWRENCE, Judge: Certain imported merchandise described in the record as pyrite concentrate was classified by the collector of customs as "pyrites," which are entitled to entry free of duty pursuant to the terms of paragraph 1777 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1777). Treating the commodity as a lead-bearing ore, the collector imposed duty upon the lead content of the importations at three-fourths of 1 cent per pound, as provided in paragraph 391 of said act (19 U. S. C. § 1001, par. 391), as modified by the trade agreement between the United States and the United Mexican States (78 Treas. Dec. 190, T. D. 50797).

The claim relied upon by plaintiff is that the entire commodity is entitled to free entry within the purview of said paragraph 1777.

The provisions of the statutes above cited read as follows:

Paragraph 1777 of the Tariff Act of 1930:

Sulphur in any form, and sulphur ore, such as pyrites or sulphide of iron in its natural state, and spent oxide of iron, containing more than 25 per centum of sulphur.

Paragraph 391 of said act, as modified, *supra*:

Lead-bearing ores, flue dust, and mattes of all
kinds------------------------------------------------¾¢ per lb. on the lead contained therein.

    *       *       *       *       *       *       *

For convenient reference, we here quote paragraph 391 as it appears in the Tariff Act of 1930:

PAR. 391. Lead-bearing ores, flue dust, and mattes of all kinds, 1½ cents per pound on the lead contained therein: *Provided*, That such duty shall not be applied to the lead contained in copper, gold, or silver ores, or copper mattes, unless actually recovered: *Provided further*, That on all importations of lead-bearing

ores, flue dust, and mattes, of all kinds the duties shall be estimated at the port of entry and a bond given in double the amount of such estimated duties for the transportation of the ores, flue dust, or mattes by common carriers bonded for the transportation of appraised or unappraised merchandise to properly equipped sampling or smelting establishments, whether designated as bonded warehouses or otherwise. On the arrival of the ores, flue dust, or mattes at such establishments they shall be sampled according to commercial methods under the supervision of Government officers who shall be stationed at such establishments, and who shall submit the samples thus obtained to a Government assayer, designated by the Secretary of the Treasury, who shall make a proper assay of the sample and report the result to the proper customs officers, and the import entries shall be liquidated thereon. And the Secretary of the Treasury is authorized to make all necessary regulations to enforce the provisions of this paragraph.

At the trial, the following agreed statement of facts was entered into by the parties:

We stipulate that the imported product is sulphur ore, i. e., pyrites or sulphide of iron in its natural state, containing more than 25 per cent of sulphur.

We further stipulate that the imported product does not contain any lead that is commercially recoverable and that it contains the following percentages of lead: .1 per cent in entry numbers 108, 1127, 1677, 2703, 3680, 4187, and 4390, and .09 per cent in entries 5289, 5354, 5456, 5788, 5973, 7509, and 8029. By that is meant 1/10th of one per cent and 9/100ths of one per cent, respectively.

Plaintiff introduced the testimony of four well-qualified witnesses which is not refuted nor rebutted since no witnesses were called by defendant. Plaintiff's witness Edward J. Langey testified that he was a geologist employed by the General Chemical Division of the Allied Chemical & Dye Corp. and that he was thoroughly familiar with the product known as a pyrite concentrate in controversy here and produced a sample typical of the importations, which was received in evidence as illustrative exhibit 1. In the opinion of this witness, the merchandise is not a lead-bearing ore because it is not one from which it would be commercially practical to recover the lead, and, as a matter of fact, his company imports the product for use in making sulphuric acid and does not procure any lead from it.

Speaking as a student of geology, Langey stated that the lead-bearing ores of commerce are what he termed "straight" lead ores from which the principal metal to be extracted is lead and various other ores, such as lead-zinc ores, and copper-gold-silver ores from which lead may be extracted. Langey would not regard merchandise represented by exhibit 1 as a lead-bearing ore in that it would not yield or produce merchantable lead, even though it actually contains from 0.09 to 0.1 percent of lead. He stated that the lead content of lead-bearing ores is from 4 to 5 percent and that the minimum lead content of any lead-bearing ores, within his knowledge, is from 2 to 3 percent; that 2 percent of lead content would be commercially recoverable in some circumstances, but a less content could not be extracted at a profit. He expressed the same opinion as to the pro-

duction of zinc from zinc-bearing ores. In all his experience, Langey knew of no instance in which it was possible to obtain lead economically from pyrites or any ore containing as little as 0.1 percent of lead.

Charles Gordon McLachlan, with a broad knowledge of metallurgy and mineralogy, testified that he was general superintendent of mills for Noranda Mines, Ltd.; that his company is engaged in the mining, milling, smelting, refining, and processing of copper primarily, but also gold, silver, and selenium. He testified to his personal knowledge of the process by which the imported material was produced, having been employed as a metallurgical consultant by the East Sullivan Mines, Ltd., Val D'Or, Quebec, where the merchandise was produced. He stated that the principal business of the East Sullivan Mines was the production of copper—"they are also recovering some gold and silver, which goes with the copper concentrate, and after they are recovered, then they also recover some zinc, and subsequently, after they had been in operation several months, they took in a circuit to recover pyrite." In describing the process by which the subject merchandise is produced from copper ore, McLachlan testified—

* * * The ore containing the minerals I have mentioned is broken underground by blasting. It is then transferred to crushers, where it is reduced to about 8 inches in size. It is then hoisted to surface and then by further crushing operation, reduced to about one-half inch in size. From there it goes to grinding mills which pulverize the ore, and reduce it to the fineness in the order of that shown in Exhibit 1.

After the copper-bearing mineral is separated, the witness stated "Then we separate or recover by floatation the sphalerite, which is the zinc-bearing mineral, and after the copper and the zinc have been separated and recovered, then pyrite is floated from the residue which is left. * * * That then has to be filtered and dried and then loaded into cars for shipment." This witness agreed with Langey that the merchandise in controversy is not a lead-bearing ore, because it does not contain lead in sufficient quantity to make its recovery commercially feasible; that, although there are minute quantities of lead in the copper ore, the most of it would be found in the copper concentrate, while the remainder would be found in the zinc concentrate—a very minute percentage remaining in the pyrite concentrate. McLachlan would regard 0.09 to 0.1 percent of lead in the imported concentrate a "trace." This witness stated that he would not consider any ore as lead bearing which had less than 2 percent of lead; that, whereas lead sulphide is a lead-bearing ore, pyrite is not a lead sulphide; it is an iron sulphide, $FeS_2$.

On redirect examination, McLachlan testified that the "planning" tests of the copper concentrate at the East Sullivan Mines disclosed such a small amount of lead that "it did not warrant our asking the Assay Office to make a definite determination." He

agreed with Langey that, in his wide experience, he had never known of anyone attempting to recover lead commercially from pyrites or ore or minerals containing as little as 0.1 percent of lead.

Plaintiff's third witness, F. R. Scherzinger, having had 40 years' experience in the purchasing department of the General Chemical Division of Allied Chemical & Dye Corp., and presently chairman of the advisory purchasing committee, testified that he purchased the subject merchandise and produced the contract for the transaction, which was received in evidence as exhibit 2. On page 3 of the contract, the "quality" was set forth in the following terms:

The concentrate sold hereunder shall contain a minimum of forty-six per cent (46%) sulphur, dry basis, and shall be approximately of the following chemical and screen specifications:

### Chemical Specification

| | | | |
|---|---|---|---|
| S | 46.0% Min. | As | Tr. |
| $SiO_2$ | 2.53% | Pb | Tr. |
| Insol. | 2.57% | Zn | 1.22% |
| Cu | .30% | Mn | Nil |
| $Al_2O_3$ | 2.85% | P less than | .005% |
| Fe | 44.41% | Se | Nil |
| MgO | Tr. | Te | Nil |
| CaO | Tr. | | |

### Screen Specification

| | | |
|---|---|---|
| On 60 Mesh | | 0. 3% |
| " 100 " | | 1. 3% |
| " 200 " | | 15. 7% |
| " 325 " | | 18. 5% |
| Through 325 " | | 64. 2% |
| | | 100. 0% |

Buyers reserve the right to reject any car or cars that do not conform to the above chemical and physical specifications

It will be noted that opposite the symbols "As" (arsenic) and "Pb" (lead) is the abbreviation "Tr.," which the witness explained indicated that the presence of those two elements was deemed to be so slight as to be entirely disregarded.

On cross-examination, the witness testified, in substance, that his company would not accept pyrites if they contained 5 percent of lead, even though they carried the desired 46 percent of sulphur; that he would consider lead an impurity "in the manufacture of sulphuric acid."

The last witness called by plaintiff was John Robert Edmonds, superintendent of the Buffalo works of the General Chemical Division of Allied Chemical & Dye Corp., a concern which produces sulphuric acid. He was shown to be an experienced practical chemist, familiar with the processes employed by his company in producing sulphuric

acid from the imported pyrite concentrate; that the pyrites are heated and, by the injection of air, oxidization occurs, forming sulphur dioxide, from which sulphuric acid is produced; that, when the sulphur dioxide is formed, the remaining material is waste in the form of a cinder containing a percentage of iron, which is of no further use to his concern but may be utilized to a limited extent in the production of cement and steel. Edmonds agreed with the previous witnesses that, by reason of the small fractional percentage of lead in the imported commodity, it was not recovered because there is no economical way of dealing with such a minute quantity.

It is clear from the foregoing résumé of the testimony of four experienced and highly qualified witnesses that the amount of lead in the imported product, ranging from 0.09 to 0.1 percent, is regarded by them as a "trace" which could not be economically recovered and, hence, is there merely as an impurity; that the primary purpose for which the commodity is imported is for the production of sulphuric acid therefrom, the only byproduct of any possible value being what the evidence discloses to be a cinder containing a certain percentage of iron; that the presence of lead in pyrites used for the production of sulphuric acid would be regarded as an impurity and, hence, objectionable.

It appears further from the record that the lead-bearing ores of commerce are those where the average lead content is from 4 to 5 percent with a minimum of 2 to 3 percent from which lead may be extracted profitably. None of the witnesses knew of any pyrites or any other ore or mineral containing as little as 0.1 percent of lead from which the lead could be extracted economically.

Upon the foregoing factual basis, which is not controverted, the problem which confronts us is whether the imported commodity is, in its entirety, entitled to free entry as "pyrites or sulphide of iron in its natural state," as provided in paragraph 1777, *supra*, or whether it should be regarded as a lead-bearing ore and, consequently, subject to the imposition of duty at the rate of three-fourths of 1 cent per pound "on the lead contained therein" pursuant to the terms of paragraph 391, as modified, *supra*.

Plaintiff argues first that the imported material is not a lead-bearing ore, inviting our attention to various definitions of the word "ore," and contends that these definitions confirm the views expressed by the witnesses that the quantity of lead in the importation is such a small percentage that it may be appropriately described as a trace and, hence, ignored in the classification of the commodity for duty purposes. Following are some of the definitions quoted by plaintiff:

Webster's New International Dictionary (1950 edition):

*Ore.* 1. A natural or native mineral that, usually may be profitably mined and treated for the extraction of any of its constituents. 4. Any material con-

taining valuable metallic constituents for the sake of which it is mined and worked; thus, cinnabar is an *ore* of mercury; less commonly, material mined and worked for nonmetals, but not including material, such as placer gravels, that may contain gold, tin, platinum, etc.; thus, pyrites is a sulphur *ore*. The term *ore* has usually been applied, among miners, to the crude material obtained without other than hand sorting of the lumps. Although not strictly correct, *ore*, for want of a more appropriate term, is often applied to nonmetalliferous material, as sulphur, fluorite, etc.

### Oxford Universal English Dictionary, volume VI:

Ore—a native mineral containing a precious or useful metal in such quantity, etc., as to make its extraction profitable.

### Standard Dictionary of the English Language:

Ore—A natural substance, sometimes forming part of a rock, containing one or more metals. The term is applied usually to a mineral from which the metal can be profitably extracted, but is sometimes extended also to non-metallic minerals; as sulphur ore.

### Encyclopaedia Britannica—14th edition, volume 16, page 874:

The word "ore" is defined in the Oxford Dictionary as "a native mineral containing a precious or useful metal in such quantity or in such chemical combination as to make its extraction profitable," and that is the sense in which it is used in commerce or by miners, although writers on mineralogy and petrology apply the word to metalliferous minerals without the above-named limitations.

### Encyclopedia Americana—1932:

ore. An ore may be defined as any mineral or aggregation of minerals from which metal or metals can be extracted at a profit.

Numerous other definitions, quoted by plaintiff from works on metallurgy, mining, and the mineral industry, are of the same tenor.

Plaintiff then cites *Harshaw, Fuller & Goodwin Co.* v. *United States*, 11 Ct. Cust. Appls. 3, T. D. 38634, wherein our appellate court referred with apparent approval to dictionary definitions of the word "ore" as substances from which metals or minerals may be extracted at a profit and which are mined for the sake of their valuable constituents. See also *Nichols Copper Co.* v. *United States*, 6 Cust. Ct. 158, C. D. 453, reversed in 29 C. C. P. A. (Customs) 186, C. A. D. 190, but on other grounds.

Upon the foregoing authorities, plaintiff contends that "the witnesses, the dictionaries, the encyclopedias, the text books and even the decisions of this court—indicates conclusively that in common parlance as well as by commercial practice, an ore is a metallic or mineral substance which is mined to obtain a valuable metal or mineral at a profit."

Plaintiff then invokes the doctrine of *de minimis non curat lex.*

A liberal translation of this legal maxim means that the law does not concern itself with trifles, and, applying this principle to the facts of the instant case, plaintiff insists with plausibility that, since the

importations show the presence of only 0.09 to 0.1 percent of lead which was "unsought, unwanted, useless, unrecoverable and actually detrimental," it should be disregarded.

In support of this doctrine, plaintiff cites the case of *United States* v. *McLaughlin & Freeman*, 13 Ct. Cust. Appls. 404, 406, T. D. 41324, from which the following statement of the court is quoted:

> The importation is sweetened chocolate which contains 0.6 of 1 per centum by weight of crushed almonds. That small percentage of almonds was probably added for flavoring purposes, but whether it was or not, it can not be said the almonds were a distinctive feature of the product or that their introduction created a product which was not entitled to bear the name of sweetened chocolate. Six-tenths of 1 per centum by weight of almonds was negligible in the commodity and no more removed the commodity from the common understanding of chocolate than would the addition of 0.6 of 1 per centum of vanilla extract or almond oil.

Reference is also made by plaintiff to *Schenkers (Inc.)* v. *United States*, 59 Treas. Dec. 1257, T. D. 44916, and *R. W. Gresham* v. *United States*, 3 Cust. Ct. 308, C. D. 263, wherein this court applied the *de minimis* rule.

The defendant insists that the language of paragraph 391, *supra*, makes it imperative that duty should be levied upon the content of lead in the imported commodity. It is argued that since the paragraph provides for "Lead-bearing ores, * * * 1½ cents per pound on the lead contained therein: *Provided*, That such duty shall not be applied to the lead contained in copper, gold, or silver ores, or copper mattes, unless actually recovered: * * *" the quoted language clearly indicates the exceptions which Congress had in mind "with respect to when the duty should not be applied."

Defendant also invites our attention to the provision in paragraph 393 of said act (19 U. S. C. § 1001, par. 393), which reads:

> PAR. 393. Zinc-bearing ores of all kinds, except pyrites containing not more than 3 per centum zinc, 1½ cents per pound on the zinc contained therein: *Provided*, That such duties shall not be applied to the zinc contained in lead or copper ores unless actually recovered: * * *.

Since Congress expressly excepted from duty not only the zinc contained in lead or copper ores, unless actually recovered, and also excepted pyrites containing not more than 3 per centum of zinc, defendant contends that the language of paragraphs 391 and 393, *supra*, points to the fact that if Congress intended to except from duty lead-bearing ores containing a small percentage of lead it would have made a specific exception to that effect in paragraph 391 similar in terms to that in respect to zinc-bearing ores in said paragraph 393.

While it is true, as stated in defendant's brief, that the *Harshaw* and *Nichols* cases, *supra*, did not present the same issues as are before us here, they do, nevertheless, lend support to the contention of plaintiff with respect to the common meaning of the term "ore."

However, our main concern here is whether or not the imported pyrite concentrate is, in fact, a lead-bearing ore within the scope of that term, as used in paragraph 391, *supra*. We believe that question is resolved by the unrefuted testimony of experienced men who are learned in the sciences dealing especially with geology, metallurgy, and mineralogy to the effect that the importations are not lead-bearing ore, in fact or in any true sense of the term, and we so find. The amount of lead present is what scientists would characterize as a mere trace, which is regarded as a negligible quantity, and, under the rule *de minimis*, should be ignored in the classification of the merchandise.

Upon the record before us, we find and hold as a matter of law that the subject merchandise is not a lead-bearing ore within the sense of paragraph 391 and that duty was improperly assessed thereon. The claim of plaintiff that the entire commodity is entitled to free entry, pursuant to the terms of paragraph 1777, *supra*, is sustained.

Judgment will be entered accordingly.

### DISSENTING OPINION

FORD, Judge: From the briefs of counsel and the majority opinion, it is clear that the involved merchandise has been considered as having been classified as a lead ore, rather than as a lead-bearing ore. I readily concede that the involved merchandise is not a lead ore. The question is whether or not the involved merchandise is a lead-bearing ore, not whether it is a lead ore. The collector first classified the involved merchandise as "pyrites," which counsel have agreed is a sulphur ore, and accorded free entry to such merchandise under paragraph 1777 of the Tariff Act of 1930. Thereafter, the collector found that the "pyrites" or sulphur ore contained a certain amount of lead, and he thereupon levied duty at the rate of three-fourths of 1 cent per pound upon the lead contained therein under the provisions of paragraph 391 of said act, treating the "pyrites" or sulphur ore as a lead-bearing ore.

All the dictionary definitions and other authorities quoted by the majority are devoted entirely to defining "ore." With the definition of ore, as given in those authorities, I am in accord. I am unable to see how the definitions of an "ore" would give any indication of what constitutes a lead-bearing ore. No duty was levied upon any ore in this case. Duty was levied only upon the lead contained in a lead-bearing ore. Since the Congress has used both the terms, "ore" and "lead-bearing ore," this would appear to constitute a clear congressional distinction between the two terms. Therefore, definitions of what constitutes an "ore" would give no indication of what constitutes a "lead-bearing ore."

Paragraph 181 of the Tariff Act of 1897 provided in part as follows:

181. Lead-bearing ore of all kinds, one and one-half cents per pound on the lead contained therein: * * *.

So far as here pertinent, the above-quoted paragraph and paragraph 391, here under consideration, are practically identical. *Cockerill Zinc Co.* v. *United States*, 13 Treas. Dec. 125, T. D. 27891, decided February 5, 1907, involved the proper classification of certain zinc ores. In deciding that case, the United States Board of General Appraisers concluded as follows:

Our conclusion is that the carbonates and silicates of zinc are included within the meaning of the term calamine as used in paragraph 514, and that they are free of duty under said paragraph and also under paragraph 614, and that the sulphide of zinc is free under the paragraph last named as crude minerals, etc., subject, however, to the qualification that when lead is found in these ores duty shall be taken on the amount of lead contained therein as described in paragraph 181.

While the above decision did not in precise words define "lead-bearing ore" as an ore which contained lead, nevertheless, such a holding is implicit in the quotation, *supra*, "that when lead is found in these ores duty shall be taken on the amount of lead contained therein." Thus, the Congress has been advised since 1907 that lead-bearing ores are ores which contain lead. This is significant in view of the language contained in paragraph 391 of the Tariff Act of 1930 as follows:

Lead-bearing ores, flue dust, and mattes of all kinds, 1½ cents per pound on the lead contained therein; *Provided*, That such duty shall not be applied to the lead contained in copper, gold, or silver ores, or copper mattes, unless actually recovered: * * *.

I am not able to place any construction upon the foregoing proviso except that when the Congress exempted from the duty of 1½ cents per pound the lead contained in "copper, gold, or silver ores, or copper mattes," it thereby expressed in clear terms its intention to make the duty of 1½ cents per pound apply to the lead contained in all other lead-bearing ores, whether or not recovered or recoverable. The above views find confirmation in the case of *United States* v. *Brewster*, decision by Burns, district judge for Texas, reported as T. D. 29006. As stated by the court, "The importations involved in the several protests consist of zinc ore * * * ." A more detailed description of the merchandise was given in the decision of this case in the Circuit Court of Appeals, Fifth Circuit, 167 Fed. 122, as follows:

The imported ores, broadly described, were: (a) Concentrated sulphides containing 28 per cent. zinc and 2 per cent. lead. (b) Carbonates crushed and hand-picked, containing 28 per cent. zinc and 7 per cent. lead. (c) Carbonates and silicates combined, crushed and hand-picked (21 to 35 per cent. carbonate, 2 to 26 per cent. silicate), in some less than 1 per cent. of lead, and in others no lead.

In disposing of the case, Burns, district judge, said:

In so far as the specific duty is concerned the question presents no difficulty; the language clearly and specifically provides that the lead contents shall be subject to duty at the rate assessed by the collector.

In affirming the decision of the Circuit Court, the Circuit Court of Appeals, Fifth Circuit, said:

PER CURIAM. Under the facts in this case it is not necessary to decide whether the provision for lead-bearing ores in paragraph 181, Tariff Act July 24, 1897, * * * is exclusive. On the merits the Board of General Appraisers and the Circuit Court ruled correctly.

The judgment of the Circuit Court is affirmed.

The provision for lead-bearing ores, construed in the above decisions, was as follows:

Lead-bearing ore of all kinds, one and one-half cents per pound on the lead contained therein: * * * .

Since lead-bearing ore was the only kind of ore made dutiable on the lead content, or the lead contained therein, under paragraph 181, *supra*, the court could not have held dutiable the lead contained therein, without an affirmative holding that zinc ore containing less than 1 percent of lead was a lead-bearing ore. It is my view, therefore, that the above authorities require a holding that the lead contained in the instant sulphur ore should be held dutiable at three-fourths of 1 cent per pound, as lead-bearing ore, as classified by the collector.

In the cases alluded to above, the courts have held a zinc ore containing less than 1 percent of lead to be a lead-bearing ore.

The following from the New International Encyclopaedia, volume 13, page 665, makes it clear that there is also a lead ore:

**Metallurgy.** Numerous minerals contain lead, but only three occur in sufficient quantities to constitute lead ores, viz., the sulphide, galena, PbS (Pb, 86.6 per cent); the carbonate, cerussite, $PbCO_3$ (Pb, 77.5 per cent); and the sulphate, anglesite, $PbSO_4$ (Pb, 68.3 per cent). Galena, the most important of these ores, is classed as argentiferous or nonargentiferous, depending upon the amount of silver present. The nonargentiferous lead ores of the United States occur chiefly in the Mississippi valley, which contributes more than one-third of the total amount of lead produced from domestic ores. Since the beginning of the present century, however, it has been found profitable to desilverize some of the lead produced from ores which were formerly classed as nonargentiferous. In recent years at least one-half of the silver and one-tenth of the gold annually produced in the United States have been obtained from lead smelting, either by the treatment of lead ores alone, or by adding silver and gold ores to the charge in the lead furnace, the reduced metallic lead serving to collect the precious metals.

The "Pb" in the above quotation stands for "lead," and it is readily understandable that an ore containing from 68.3 to 86.6 percent lead would be profitable to mine and work for the lead contained therein. This would necessarily make such an ore a lead ore under the definitions of an ore, quoted by the majority. I wish to again emphasize

the fact that we are not here dealing with a lead ore, but with a lead-bearing ore.

In the case of *American Smelting & Refining Co.* v. *United States*, 13 Ct. Cust. Appls. 507, T. D. 41391, the merchandise involved consisted of irrecoverable zinc in lead ore. In disposing of that case, the Court of Customs Appeals said:

There is nothing in the language or circumstances surrounding the passage and approval of the Tariff Act of 1922 that leads us to the conclusion that metals lost in the smelting and refining processes in bonded smelters were to be admitted free. It is true that a reasonable allowance must be made by the Secretary of the Treasury for wastage. It is also true that if the zinc content is less than 10 per centum, it is not dutiable. If Congress had intended to make a change in this respect it might easily have done so with few words. General Appraiser Fischer very aptly points out, in the opinion of the court below, that in paragraph 392, the paragraph imposing duties upon lead bearing ores and mattes, this significant exception is made, which did not appear in the equivalent paragraph in the tariff act of October 3, 1913:

*Provided,* That such duty shall not be applied to the lead contained in copper mattes unless actually recovered.

Counsel for appellant suggest here that they presented fully their viewpoint to the congressional committees framing this act. Is it not strange that if Congress had intended to exempt zinc in lead ores from duties, it did not use fit language to accomplish that purpose such as it used relative to copper mattes?

Appellant also insists that the zinc in question was not imported, within the meaning of our customs laws, and cites *Marriott* v. *Brune*, 9 How. 619, and other cases, in support of his contention. The cases cited, in each instance, go off upon the principle that merchandise, to be dutiable, must actually arrive in the country; that if it is lost on the voyage, or for other reason is not imported, it is not dutiable. This is conceded law. But no such principle applies here. There can be no controversy that the zinc contained in the imported ores came within the customs jurisdiction of the country. *United States* v. *Shallus*, 2 Ct. Cust. Appls. 332. It was therefore imported, unless some contrary provision of law prevents such construction. We know of no such provision and must therefore hold the zinc in question was imported.

\*　　　\*　　　\*　　　\*　·　　　\*　　　\*　　　\*

\* \* \* Retaining the recoverable product of his operations, he seeks the destruction of the irrecoverable residue and the cancellation, thereby, of a part of his bonded obligation. We believe that to so hold would be to accomplish by indirection what we have said, herein, we can not do by direction.

The holding in the case of *Consolidated Kansas City Smelting & Refining Co.* v. *United States*, 1 Ct. Cust. Appls. 472, T. D. 31509, is to the same effect as the decision in the *American Smelting & Refining Co.* case, *supra*, the gist of the decision being succinctly stated in the second paragraph of the syllabus, as follows:

2. LEAD-BEARING AND ZINC-BEARING ORES.

A commodity, it is true, is properly assessable in its condition as imported, but where ore, as here, is shown to have contained, as imported, both lead and zinc, the zinc appearing in a quantity exceeding 10 per cent, the metal content in both is dutiable, the lead under paragraph 181, the zinc under paragraph 193, tariff act of 1909.

It is my view that the question of what constitutes a "lead-bearing ore" is a matter of law to be decided by the court. While opinion testimony of experts as to what constitutes a "lead-bearing ore" may be accepted as an aid to the understanding of the court, such testimony is not in any sense binding upon the court. Therefore, the fact that all of plaintiff's witnesses testified that the involved merchandise was not "a lead-bearing ore" is of little, if any, assistance in determining the question here presented.

In view of the fact that it was held in the *Brewster* case, *supra*, that an ore containing less than 1 percent of lead was a lead-bearing ore, and in view of the further fact that, since the *Brewster* decision, the Congress has reenacted the paragraph there construed in each succeeding tariff act in practically identical language, this appears to be a strong case for the application of the rule of legislative approval of judicial construction.

In each of the "lead-bearing ore" paragraphs since the Tariff Act of 1897, the Congress appears to have made it clear that it intended to levy duty upon any and all lead contained in lead-bearing ores. This, in my opinion, precludes the application of the rule of *de minimis non curat lex*, invoked by the majority herein. I would, therefore, hold the pyrites, or sulphur ore herein, to be a lead-bearing ore, and the lead contained therein to be dutiable as assessed by the collector.