(C.D. 2159)

RICO PRODUCTS CO. ET AL. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 23, 1960)

*Lawrence & Tuttle* (*Barnes, Richardson & Colburn* by *Edward N. Glad* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff* and *Henry J. O'Neill*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

MOLLISON, Judge: In a decision reported as *J. E. Bernard & Company, Inc.* v. *United States*, 41 Cust Ct. 1, C.D. 2011, this court held that certain sticks cut from a reed known as Arundo donax were "in the rough" and entitled to free entry under the provisions of paragraph 1806 of the Tariff Act of 1930, providing for—

Woods: Sticks of partridge, hair wood, pimento, orange, myrtle, bamboo, rattan, india malacca joints, and other woods not specially provided for, in the rough, or not further advanced than cut into lengths suitable for sticks for umbrellas, parasols, sunshades, whips, fishing rods, or walking canes,

as claimed by the plaintiff, rather than to be dutiable at the rate of 10 per centum ad valorem under the provision for—

Wood, unmanufactured, not specially provided for,

in paragraph 405 of the said act, as modified by T.D. 51802, as assessed by the collector.

The protests enumerated in the schedule attached hereto involve importations of merchandise the same as or similar to that involved in the *Bernard* case, *supra*, which was assessed with duty under paragraph 405, *supra*, and is claimed to be entitled to free entry under paragraph 1806, *supra*. The issue has been retried in the present case by reason of the determination of the Bureau of Customs to limit the application of the decision in the *Bernard* case to the importation there involved, since it was "believed that evidence can now be obtained to support the Government's position" (T.D. 54716).

As explained by counsel for the defendant at the trial of the present case, the person whom the defendant hoped to call as its witness died shortly before the trial of the present case, and the defendant, consequently, offered no new evidence at the trial thereof. However, in addition to the record in the *Bernard* case, which was incorporated herein upon motion of plaintiffs' counsel and without objection on the part of the defendant, the present record contains more detailed testimonial and real evidence as to just what was done to bring the imported merchandise from the condition in which it was found in nature to the condition in which it was imported.

It is the contention of the defendant that the combined record establishes, as matter of fact and law, that the imported merchandise is not "in the rough" and that the provision in paragraph 1806 for sticks "not further advanced than cut into lengths suitable for sticks for umbrellas, parasols, sunshades, whips, fishing rods, or walking canes" is inapplicable to the merchandise.

In our opinion in the *Bernard* case, *supra*, we summed up the evidence therein as to the nature of the sticks and what had been done to them prior to importation as follows:

According to the evidence, the source of the imported merchandise is a giant reed, Arundo donax, grown in France. This reed grows to considerable height

and tapers from the bottom to the top, where there are a few stems with a sort of a flower. At intervals of 6 to 12 inches, there are on the stem of the reed what are called nodes, seemingly similar to those found in bamboo stems. The reed is hollow, except at the nodes, which divide it into sections.

In reaching the condition of the merchandise imported, the reed is first harvested and then "stripped," presumably meaning that the top stems and flower and the skin or bark are taken off. It is then sawed or cut sectionally, so that the result is a number of tubes, varying in length from 6 to 12 inches, represented by plaintiff's exhibit 1. The nodes are entirely cut off, as exhibit 1 does not show any sign of their presence. The pieces are then allowed to dry and season in the air, after which they are sorted into two diameter sizes, one being up to 24 millimeters in diameter and the other from 24 to 27 millimeters. The record indicates that there is also a specification as to the thickness of the wall of the reed pieces. They are then packed in sacks and exported to the United States, and, after importation, they are used in the manufacture of reeds for musical instruments.

In the present case, it was conceded on behalf of the defendant that the imported merchandise consists of sticks and that it was unmanufactured. While none of the statements contained in the foregoing excerpt from our decision in the *Bernard* case has been seriously contradicted by the evidence offered in the present case, there is in the present record some amplification of the details in that it appears that, after being harvested, the cane is "staked" outdoors for a period of about 6 months in order to dry and season. The exact nature of the staking was not given in the record, but it appears to be a stacking of the pieces of cane in the open in such a way as to keep them out of contact with the ground, thus aiding in their seasoning.

After the staking period is over, it appears that the cane is topped, i.e., the excess part having no value for manufacturing purposes is removed, and it is again put out in the air and sun to "cure" or season for another 6 months, following which it is stored, presumably indoors, for another 6 months or a year.

Following the seasoning and curing of the cane as above described, it is denoded by being cut sectionally on each side of each node. It appears that the cuts to remove the node are made by the exporters as close to the node as possible, which makes it difficult, if not impossible, to determine, without further cutting, whether the desired portion of the cane, i.e., the section of uniform thickness between the nodes, is of the thickness required to manufacture into reeds for specific musical instruments, i.e., clarinets and the various types of saxophones.

It also appears that the sorting into two sizes to which the pieces of cane are subjected abroad is of little or no value to the importers or manufacturers of musical instrument reeds in this country, first, because it is on a hit-or-miss basis and without the use of measuring instruments, and, second, because a greater price is paid to the exporter for the thicker, or so-called saxophone type of cane, than for the

thinner, or so-called clarinet type, with consequent incentive to the exporter to resolve any doubts in favor of classifying pieces of cane as the saxophone type.

It appears to be the defendant's position that the operations of stripping the bark, topping the unwanted leaves and branches, seasoning and curing, denoding, and sorting took the sticks at bar out of the purview of paragraph 1806.

So far as stripping of the bark and topping the leaves and branches are concerned, we think the case of *United States* v. *Benneche*, 6 Ct. Cust. Appls. 92, T.D. 35339, is authority for holding that such operations do not change the category of sticks into anything else. It was there said:

> It is manifest that the cutting off of limbs or rootlets, not accompanied by any smoothing or finishing process, would still leave the wood in the rough, and we think the removal of the bark does not change that condition. It is well known that the preservation of some kinds of timber requires the early removal of the bark after cutting, and Congress could not have intended that its removal alone would change the classification of woods from paragraph 713 [of the Tariff Act of 1909, and the predecessor of paragraph 1806 of the present act] to paragraph 203 [the predecessor of paragraph 405 of the present act]. It would not be a manufacture any more than would hewing, which necessarily involves bark removal; in no way is it a treatment of the wood itself; it does not change or alter its condition, and if in the rough before the bark was removed, its removal would not affect it for tariff purposes.

We fail to see how seasoning and curing, i.e., simply leaving the cane in the air and sun for long periods of time, can be considered to be operations which change sticks from a condition "in the rough" to anything else. After having been seasoned and cured, they are merely seasoned and cured sticks in the rough. At any rate, neither specific argument nor citation of authorities on the points of seasoning and curing and of stripping and topping are made in the brief filed on behalf of the defendant.

This leaves only the operations of denoding and of sorting as the basis for the contention of the defendant that the sticks at bar are not "in the rough." In this connection, defendant cites a number of cases which, we think, far from establishing the correctness of defendant's position, supports that of the plaintiffs.

Thus, among others, defendant cites the case of *Great Pacific Co.* v. *United States*, 59 Treas. Dec. 207, T.D. 44580. In that case, it was held that if palm fibers were obtained by soaking palm leaves in water and stripping the pulp from the ribs, the ribs being roughly sorted at the same time into lengths of 16, 18, or 29 inches and tied into bundles, such palm fibers were not dressed or manufactured, but that if, in addition, the fibers were *resorted and cut into exact lengths*, the palm fiber so treated was thereby advanced in condition

by dressing and became a manufacture within the purview of the statute.

The evidence in the combined record in the case at bar establishes clearly that the cutting to which the imported cane was subjected abroad was *not a cutting into exact lengths,* but merely a denoding operation, designed to get rid of protuberances, very like the operation of cutting off limbs or rootlets and not accompanied by a smoothing or finishing process, referred to above in the excerpt quoted from the *Benneche* case, *supra,* as leaving wood "in the rough."

Moreover, the sorting to which the cane at bar was subjected was at most a *rough* sorting, leaving the pieces of cane comparable to the palm fibers in the *Great Pacific Co.* case, *supra,* before being dressed, rather than to the fibers which had been advanced by being resorted and cut into exact lengths.

For these reasons, we consider the *Great Pacific Co.* case, *supra,* as demonstrating that the processes to which the cane at bar had been subjected were not such processes as advanced the cane from the rough state.

*Cone & Co. (Inc.)* v. *United States,* 14 Ct. Cust. Appls. 133, T.D. 41672, also cited by the defendant, related to palmyra fibers, separated from the plant and tied into bundles with one end evened, which, it was held, had not been manufactured or dressed within the meaning of those words as used in various paragraphs of the acts of 1913 and 1922. The applicability of the decision in that case to the proposition for which it was cited in defendant's brief, i.e., that the operations to which the merchandise involved in the present case was subjected established that it is not "in the rough," is not manifest to us, inasmuch as the merchandise, the operations performed, and the tariff provisions involved are not the same, and, if considered to be analogous, the result would be in favor of the plaintiffs' claim herein.

*Great Pacific Co., Inc.* v. *United States,* 64 Treas. Dec. 590, T.D. 46757, also cited by the defendant, involved dressed palm fiber such as was held in the earlier *Great Pacific Co.* case, *supra,* to be advanced in condition and manufactured. The later case held that such dressed palm fiber was not wood in the rough, but, as shown above, the dressing operations which advanced the palm fiber to the condition of a manufacture were not comparable to the cutting and sorting operations performed on the merchandise at bar.

*United States* v. *Winter & Smillie,* 4 Ct. Cust. Appls. 522, T.D. 33939, also cited by the defendant, related to reeds made from rattan, and the tariff competition in that case was between the predecessor of the present paragraph 1806 (i.e., paragraph 713 of the free list of the Tariff Act of 1909), and a provision in paragraph 212 of the dutiable schedule of the 1909 act for "chair * * * reeds wrought or

manufactured from rattans or reeds." It was there held that since the imported reeds were in the crudest form in which reeds were imported, and were not made for or designated as chair reeds, they were entitled to classification under the free list provision.

Here, again, it is difficult to see the connection between the cited case and this case with respect to the proposition for which defendant cites it, and no connection is developed in the brief. However, the citation would appear to be apt on the proposition that the words "or not further advanced than cut into lengths suitable for sticks for umbrellas, parasols, sunshades, whips, fishing rods, or walking canes" are words extending the coverage of the provision for sticks in the rough, and not words limiting that provision.

Indeed, when the decision in the *Winter & Smillie* case, *supra*, is read together with the decision in the *Benneche* case, hereinbefore cited, it would appear that sectional cutting of the sticks covered by paragraph 1806, *supra*, is among the operations which may be performed on such sticks without taking them out of the purview of the paragraph, so long as such cutting does not advance them further than leaving them in lengths suitable for sticks for the articles named. In other words, sectional cutting which results in sticks that are *less* carried to completion than being cut to lengths suitable for certain articles are, for the purposes of the provision, still "in the rough." Thus, in the *Benneche* case, the court said:

* * * This provision of paragraph 713 does not mean that a cutting into lengths suitable for purposes other than those specified in the last part of the paragraph excludes classification thereunder unless thereby the sticks are further advanced than when cut into lengths suitable for sticks for umbrellas, etc. It is no more an advancement to cut the rough boxwood sticks into lengths suitable for umbrella handles than it is to cut them into lengths suitable for umbrella sticks, canes, etc. They are still boxwood sticks in the rough.

The fact must not be lost sight of that these sticks are *not* umbrella handles, but are to be used in the making of those articles. They are material suitable for that use and have been cut into lengths adapted to that purpose. Their appearance does not stamp them as being unsuitable for other uses. The evidence is that their *principal* use is for umbrella or parasol handles. * * * [Italics quoted.]

The cutting off of the nodes of the cane here involved did not thereby cut the cane into lengths suitable, at least from the standpoint of length, for musical instrument reeds, or, indeed, suitable for any particular purpose. The length in which the cane is imported is determined, not by the ultimate use to be made of the cane, but by the distance between the nodes and the exporter's interest in cutting off the least amount of material so as to achieve the greatest weight of resultant cane. As we said in our earlier decision—

The lengths in which the sticks were cut did not *make* them suitable for any particular purpose—they were cut in those lengths only in order to see if they

could be used for certain purposes. The cutting to length and elimination of the nodes did not cause the sticks to meet the tolerances of the specifications; the sticks met those tolerances as the result of natural growth and seasoning. The situation is that neither the cutting to length nor cutting off of the nodes advanced the sticks along the lines of their ultimate use, or of any other use. It merely made it possible to determine whether they could be used as raw material for the manufacture of musical instrument reeds. [Italics quoted.]

We are of the opinion that neither the evidence offered in the case at bar nor the law as represented by the decisions cited in the defendant's brief warrants a departure from the ruling made in the *Bernard* case, *supra*, as to the merchandise involved in these cases which is in all respects identical to that involved therein, i.e., which is hollow or tubular in form.

However, it appears that the present cases also involve shipments of cane from Spain which, after harvesting, curing and seasoning, topping, denoding, and sorting, had been quartered, i.e., split lengthwise into four pieces. It is clear from the record that such quartering or splitting did nothing to advance the cane along the lines of its ultimate manufacture into musical instrument reeds—in fact, it appears to have made necessary some nine additional operations which are not necessary in the manufacture of musical instrument reeds with the use of the tubular cane imported from France.

The reason the Spanish cane was quartered or split, according to the record, was to permit shipment in so-called shoe boxes which were less expensive in the country of exportation than the sacks in which the tubular type of cane was shipped from France. In other words, the sole purpose of the quartering or splitting was to facilitate shipment, and it was a detriment, rather than an aid, in preparing the cane for the only ultimate use which, according to the record, such cane has, that is, in the manufacture of musical instrument reeds.

We are of the opinion that the quartering and splitting of the cane, under the circumstances here shown, did not constitute an advancement or manufacture of the cane which would take it out of the category of sticks "in the rough." The principle governing the situation is that set forth in *United States* v. *C. J. Tower & Sons*, 17 C.C.P.A. (Customs) 90, T.D. 43427, and cases cited therein, in which it was held that grinding or crushing operations, performed on imported material, only for convenience and economy in packing and shipping, and without the accomplishment of any other purpose, were not such as would be considered to have advanced such material for tariff classification purposes.

Judgment will, therefore, issue sustaining the claim made in each of the protests for free entry under paragraph 1806.