(C.D. 2407)

NATIONAL LEAD CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 8, 1963)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* and *M. Barry Levy* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Sheila N. Ziff,* trial attorney), for the defendant.

Before DONLON and RICHARDSON, Judges

DONLON, Judge: The merchandise in these three cases, consolidated at the trial, is described in the invoices as antimony ore briquettes. It was imported from Algeria at various times between June 29, 1955, and April 4, 1956, and assessed with duty at 15 per centum ad valorem under paragraph 214 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as earthy or mineral substances, partly manufactured, not specially provided for.

All of the protests, as originally filed, claimed that the merchandise is duty free under section 2 of Public Law No. 869, 81st Congress, as amended by Public Law No. 678, approved August 27, 1954 (T.D. 53585), or by Public Law No. 66, approved June 8, 1955 (T.D. 53828). Either in the original protest or by protest amendment claim is also made that the merchandise is duty free, under paragraph 1608 of the Tariff Act of 1930, as antimony ore.

Plaintiff has not presented either evidence or argument in support of its claim under amended Public Law No. 869. We deem that claim abandoned, and it is dismissed.

The pertinent provisions of the tariff act, as modified, are as follows:

[PAR. 214.]   Earthy or mineral substances wholly or partly manufactured and articles, wares, and materials (crude or advanced in condition), composed wholly or in chief value of earthy or mineral substances, not specially provided for, whether susceptible of decoration or not, * * *:

    If not decorated in any manner :

*         *         *         *         *         *         *
    Other _____ 15% ad val.

PAR. 1608.   Antimony ore.   [Free.]

There are in evidence certain written interrogatories and the deposition of Pierre Thiery, taken pursuant to a commission issued by the court, together with the invoices, entry papers, and United States Customs Laboratory analyses attached to the official papers. There is also testimony of Phil W. Ruppert.

The laboratory reports state as follows:

| | |
|---|---|
| Protest Nos. 324719–K and 58/6849 | The sample in the form of small lumps is antimony ore containing 0.6% lead and 0.6% zinc. |
| | Information obtained from the importer indicates that the ore, in the form of "fines", is mixed with a binder (probably cement) and pressed into bricks.   C.I.E. 308/54 noted. |
| Protest No. 58/6467 | The sample in the form of a broken brick is antimony ore containing 0.6% lead and 0.2% zinc. |
| | Information obtained from the importer on similar importations from Algeria indicates that the ore is mixed with a binder and pressed into bricks.   C.I.E. 308/54 noted. |

Pierre Thiery, consulting engineer, testified in answer to the written interrogatories that he was employed as manager of the Societe des Mines d'Ain Kerma, in Algeria, from 1934 to 1960, and that he was familiar with the antimony ore briquettes shipped by the Societe to the United States, including the merchandise of these protests. He said the merchandise was antimony ore, "an iron antimoniate which we call 'flageolotite.' " He described the condition of the merchandise, in the mine, and the processes performed upon it, as follows:

In the mine, layers were 5 or 6 metres thick and the ore was very clayey and friable. It is a hygroscopic ore which is pulverous and has a tendency to absorb the moisture in the air or rain. There are practically no pieces. It is a friable and pulverous yellow ore.

*　　　*　　　*　　　*　　　*　　　*　　　*

The run-of-mine ore was brought out of the mine in bulk and was roughly sorted by hand to free it from the little calamine it might contain and from the grey clay it contained. To put it into briquettes afterwards, when we had to do so, we mixed it with water and a little cement (5% of the weight of the ore), to agglomerate it. We then passed it through a compacting press. The briquettes were moulded, put to dry and were then ready for shipment.

The briquettes were not shipped in containers, but were handled manually, two by two, and loaded in bulk.

According to M. Thiery, the Societe des Mines d'Ain Kerma sold the greater part of its production to its parent company, in France, in bulk without briquetting. He said that bulk ore had a very poor appearance; that it became powdery in hot weather and that the wind blew some away, causing a good deal of loss; and that when it rained, the ore formed a clayey magma, which was difficult to handle. Several trial lots were shipped to the United States in bags, but the bags were expensive. The witness testified:

* * * We were obliged to ship in bags because the merchandise was being sent to America and had to be unloaded and reloaded in Marseilles, in transit, and we preferred to ship it in bags because if it had rained on it, the merchandise would have looked very bad.

*　　　*　　　*　　　*　　　*　　　*　　　*

Our Manager asked us whether we could not make briquettes so as to avoid the cost of bags and also the risk of bad weather, loss and moisture. I answered that we could very well do so * * *.

The witness stated that the price of the antimony ore briquettes is not higher than that of the same quality antimony ore, unbriquetted, as the difference is only a matter of packing and form.

Phil W. Ruppert, assistant manager of the metal department and manager of the Atlantic branch of National Lead Co., plaintiff herein, testified that he had been with National Lead for 33 years, during which time he had served as auditor, had been in charge of a smelter at Cleveland, and had worked in smelters at Indianapolis and Chicago He came to New York about 10 years ago and had recently been

transferred to Perth Amboy, N.J., where he is in charge of the metals division. This division buys all forms of metal and turns them into finished or semifinished products, for industrial use. During his 33 years with National Lead, he has become familiar with antimony metal, which is produced by his company. National Lead has an antimony smelter at Laredo, Tex., which smelts antimony ore from the company's own mines in Mexico.

Mr. Ruppert testified that he was a party to the contract for the purchase of the merchandise in issue. That contract is in evidence. (Exhibit 1.) The merchandise is described in the contract as antimony oxide ore in briquettes, analyzing approximately as follows:

| | | | | | |
|---|---|---|---|---|---|
| Sb [antimony] | 37.0 | –42.0% | Zn [zinc] | 1.0 | – 4.0% |
| Pb [lead] | 0.30 | – 1.00% | Fe [iron] | 23 | –24% |
| As [arsenic] | 0.50% | | $SiO_2$ [silicon dioxide] | 2.0% | – 4.0% |

The contract provided for payment at $2 flat per short ton unit of antimony contained.

Mr. Ruppert described a blast furnace as a shaft into which a strong blast of air is blown. The imported material is placed in the shaft, in "judicious" amounts, with various metal-containing materials, such as residues, slags, ore, cases of old automobile batteries, for the purpose of producing antimonial lead. He explained that the product must meet chemical specifications, requiring 6 to 10 per centum antimony, and that the antimony ore is used in particular quantities to increase the antimony content to the specified amount. That is what he meant by "judicious" amounts. The materials are mixed in the furnace with coke and heated to 2,000 or 2,300 degrees Fahrenheit. Carbon is combined with the oxygen in the ore to derive the antimony from it. Impurities are liquefied and withdrawn from one side of the furnace as slag. From the other side, comes the metal produced by the chemical action in the shaft of the furnace. Flue dust, which consists partially of the materials from which the metal is to be extracted, goes up in the blast of air and is caught in what is called a "bag house." That is a series of woolen bags which catch dust and allow the clear, clean gases to escape to the atmosphere. Periodically, the bags are cleaned and the flue dust returned to the blast furnace.

According to Mr. Ruppert, the 5 per centum cement which had been added to the ore as binder in order to make the briquettes was not of any advantage in the smelting operation, but, in fact, was a detriment because the lime and other constituents of cement had to be converted into slag and thrown away. Moreover, there was no advantage in having the material in briquette or lump form, because the heat would break down the lumps and whatever was going to be blown over to the "bag house" would be blown over anyway. The

witness said that the National Lead plant at Laredo had a briquetting machine. Some ore was briquetted there, and some was not. He testified on cross-examination:

X Q. By reason of briquetting the ore, don't you reduce the amount of flue dust which is blown up through the blast?—A. That is a matter which is debatable among smelting people, as old as time.

X Q. You don't know whether the amount of flue dust is reduced, as a result of briquetting?—A. I don't think anyone knows.

X Q. Would you just speak for yourself, please. Do you know?—A. I don't think it does.

The witness did not agree with a statement from Hoffman on General Metallurgy (a 1913 work) to the effect that ore and flux should not be fine, as fine material makes the furnace work slowly and irregularly, and the blast causes a large portion of the finest particles to be carried off as flue dust. He stated that, at present, smelters do not have flue dust to the extent feared by Mr. Hoffman and that the material used is not the same as that employed 50 years ago.

Mr. Ruppert said that when the merchandise arrived, many briquettes were broken up, so that only about 50 per centum was in briquette form and the other 50 per centum was powdered.

Plaintiff claims that the provision for antimony ore in paragraph 1608 is an *eo nomine* provision without limitation, thus including all forms of the article, and that the merchandise here is a form of antimony ore. Defendant contends that the term "ore" is limited to a natural or native mineral and that the imported merchandise is no longer ore, but has been advanced for the smelting process by several processes, including sorting by hand, mixing with water and cement, and making into briquette form.

While definitions of the term "ore" seem to agree that it is a substance or material containing metals which can be profitably extracted by smelting or other treatment, "ore" has been variously described as a native mineral, a native metal, a natural substance, forming part of a rock, any mineral or aggregation of minerals, a mineral mass, or a rock mass. See definitions quoted in *Nichols Copper Co.* v. *United States*, 6 Cust. Ct. 158, C.D. 453; reversed on other grounds, *United States* v. *Nichols Copper Co.*, 29 CCPA 186, C.A.D. 190. A mineral is a chemical element or compound occurring in nature, not one prepared in the laboratory or by complex manufacturing processes. *Philipp Bros. Ore Corp.* v. *United States*, 45 Cust. Ct. 64, C.D. 2199.

The merchandise before the court was originally found in nature and then was ore. The question is, whether the natural substance has been so processed as to make it something other than "ore."

In *Harshaw, Fuller & Goodwin Co.* v. *United States*, 11 Ct. Cust. Appls. 3, T.D. 38634, a case construing paragraph 396 of the Tariff Act of 1913, which covered antimony ore and stibnite containing

antimony, the court said that the classes of ore contemplated by that paragraph were those usually referred to as including the gangue or other product of the mine in its natural state. The merchandise there had been subjected to a liquation process, which was described as follows (p. 5):

> * * * natural ore is placed in a crucible-shaped receptacle with a hole in the bottom of it, below which is situated a crucible; heat is applied, a sulphide of antimony is fused and flows away from the gangue into the lower crucible; the material is then poured into molds and is the material which comes into the market as "antimony crudum."

The court held that the described process was smelting and that the merchandise was to be classified as matte containing antimony, not as antimony ore.

The courts have also held that other merchandise could not be regarded as ore, including the following:

1. Cobalt ore, which had been roasted for the purpose of eliminating arsenic, subjected to an acid treatment resulting in the concentration of certain soluble components, and certain of these separated from the rest, leaving a residuum that as to its constituent elements differed greatly from the ore as mined. *Tower & Sons* v. *United States*, 11 Ct. Cust. Appls. 155, T.D. 38947.

2. Merchandise, known as Burrowlite, produced by roasting iron ore, removing the slag and most of the sulphur, and grinding the remaining substance. *Burrowlite Products Co.* v. *United States*, 52 Treas. Dec. 234, T.D. 42415.

3. Iron ore, which had been ground and subjected to a levigating or flotation process, by which impurities were first drawn off and then the precipitate was formed into cakes and pulverized, which then were ready for use in the manufacture of leather board or fiber board, or to be made into paint, when mixed with the proper vehicle. *Geo. Z. Collins* v. *United States*, 17 Treas. Dec. 48, T.D. 29497.

4. Corundum ore, crushed until fine enough to pass through various sieves, the impurities washed away with water, graded according to size, and ready for use. Only 1 part in 10 of the original material was recovered as corundum. *Myers* v. *United States*, 1 Ct. Cust. Appls. 506, T.D. 31531.

In all four of the above cited cases, the ore had been processed more elaborately than has the ore in this case.

On the other hand, in *Procter & Gamble Manufacturing Co.* v. *United States*, 60 Treas. Dec. 508, T.D. 45156, the court held that the merchandise known as calcined spathic iron ore was to be classified as iron ore. It was produced by burning raw iron, which had been placed in large piles and ignited by the use of a few sticks of wood. During the process, coal and carbon dioxide, amounting to 44 to 48 per centum of the material, were driven off. Although the Gov-

ernment there claimed that the merchandise should be classified as an earthy or mineral substance (the same claim here made), the court held it was properly to be classified as iron ore, stating:

All of the witnesses agreed that the merchandise in question was iron ore, judging not only from its physical characteristics but from the chemical analyses of the Government and importer's chemists. They all agreed that it was suitable for the production of iron, and the evidence shows that it was actually used to make sponge iron.

Paragraph 1597, *supra*, provides for iron ore without qualification and without the limitation of the words "not specially provided for." In the case of *Francklyn et al.* v. *United States*, 119 Fed. 470, the circuit court said:

Congress having seen fit to levy a duty of 40 cents per ton on iron ore without qualification as to its use, and without the limitation "not specially provided for," such designation must stand.

\*　　\*　　\*　　\*　　\*　　\*　　\*

\* \* \* In the case at bar the merchandise is shown by chemical analysis to be iron ore. It is a native compound. The removal of the coal from the iron ore did not affect the native compound of the iron with the combined oxides. [Pp. 512–513.]

In *Cockerill Zinc Company* v. *United States*, 13 Treas. Dec. 125, T.D. 27891, the merchandise was zinc ores, and the claim was under paragraph 614 of the Tariff Act of 1897 as crude minerals, not advanced by refining, grinding, or other process of manufacture. The court said:

It is urged that these ores are excluded from the provisions of paragraph 614 by reason of the fact that, as appears from the evidence, after being dug from the mine the large pieces were crushed by hand or machinery and the fragments that contained no zinc ore were thrown away. The object of this proceeding is to avoid paying freight charges on rock and dirt. It has been held that while any labor bestowed on an article in a process of manufacture, the mere removal of foreign matter from a product of nature—the elimination of rocks and dirt from zinc ore, for instance—would not operate to take such ore out of paragraph 614, for it is still crude ore, not refined, ground, or manufactured. [Pp. 128–129.]

On removal from the mine, the ore of these suits was roughly hand sorted to remove a small amount of calamine and the gray clay. What remained was a native compound of antimony with other elements. But it then was still a crude ore, not refined, ground, or manufactured.

There was one further process. The crude ore was pressed into briquette form after water and cement had been added as a binder. Did this process convert the merchandise into something more than antimony ore? We think not.

It is well settled that an *eo nomine* statutory designation of an article, without limitation or a demonstrated contrary legislative intent, judicial decision, or administrative practice, and without proof of commercial designation, is deemed to include all forms of the article. *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, T.D. 47464.

Whether an article which, at one stage is appropriately classified under a particular designation, has been so altered by subsequent operations that the designation is no longer appropriate, is a question of fact. *John J. Coates Co. et al.* v. *United States*, 44 CCPA 97, C.A.D. 643.

In several recent cases, we have held that wood charcoal, which had been ground, mixed with starch or other material as a binder, and formed into briquettes, is to be classified as wood charcoal, provided the record establishes that the additive and the change of form did not effect so significant a change in physical characteristics or in use as to indicate that the merchandise had become something other than wood charcoal. *Britton & Company* v. *United States*, 41 Cust. Ct. 64, C.D. 2021; *James G. Wiley and Eijiu Sasajima* v. *United States*, 44 Cust. Ct. 346, Abstract 63822; *A. L. Farnsworth* v. *United States*, 50 Cust. Ct. 62, C.D. 2389.

In the *Britton* case and the *Farnsworth* case, it appeared that the additive did not change the character of the merchandise; that it was used solely to bind together the ground charcoal; and that the briquettes were used for the same purpose as charcoal in its original form—that is, to supply heat for cooking. Except for their value in holding together the ground charcoal, the additives were shown to be detrimental, in one case, because they added an odor, and, in the other, because they made the charcoal difficult to ignite.

In the instant case, it appears that cement was added solely as a binder and that it was otherwise detrimental, because it had to be converted into slag and thrown away during smelting. According to Mr. Ruppert, briquetting does not reduce the amount of flue dust, because the heat of the blast furnace will break up the lumps and dust will be blown to the bag house anyway. Furthermore, the briquetting process here did not change the form of the material permanently. By the time it arrived in this country, testimony shows that half of it had already reverted to powder form.

The laboratory analyses referred to the merchandise as antimony ore, and the contract of sale described it as antimony oxide ore in briquettes. M. Thiery described it as a particular kind of antimony ore, "an iron antimoniate which we call 'flageolotite.'" It was exported in briquette form solely to facilitate shipping, due to the fact that this particular antimony ore is pulverous and has a tendency to absorb water. When shipped in bulk, the wind would blow some of the ore away, and rain would cause it to form a clayey magma, which is difficult to handle. Whether in bulk or in briquette form, it was used in the same way, that is, in smelters with other materials in order to produce an antimonial lead.

It is well established that processes to which a crude or unmanufactured material has been subjected, designed solely to facilitate

shipment, do not take it out of classification proper to its crude or unmanufactured state, even if such preparation may incidentally advance the material for its intended use. *Lackawanna Steel Co. et al.* v. *United States*, 10 Ct. Cust. Appls. 93, T.D. 38359; *Gulf Gypsum Co.* v. *United States*, 20 CCPA 101, T.D. 45725; *Rico Products Co. et al.* v. *United States*, 44 Cust. Ct. 100, C.D. 2159; *Gould Monument Works* v. *United States*, 44 Cust. Ct. 107, 111, C.D. 2160. Here, the proofs show there is no such incidental advancement toward intended use.

On the record before us, we hold that the merchandise is that form of antimony ore known as flageolotite, that it has not been converted into something other than antimony ore, and that it is entitled to free entry under paragraph 1608 of the Tariff Act of 1930 as antimony ore.

To that extent, the protests are sustained. Other protest claims, having been abandoned, are dismissed. Judgment will be entered accordingly.