(C.D. 4166)

Union Carbide Int'l Co. *v.* United States

United States Customs Court, Third Division

(Decided January 25, 1971)

*Rode & Qualey (Ellsworth F. Qualey* of counsel) ; *Otto Kinzel,* associate counsel ; for the plaintiff.
*L. Patrick Gray, III,* Assistant Attorney General (*Bernard J. Babb,* trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge

ROSENSTEIN, Judge : This case involves the classification of certain merchandise, invoiced as "Manganese Nodules", which had been mined in British Guiana (now Guyana) and Ghana, thence shipped to Sauda, Norway for processing, and subsequently shipped to the United States where it was entered at the port of Baltimore in August 1964 as manganese ore under TSUS items 601.27 and 911.07. The merchandise was classified under TSUS item 603.70 as other metal-bearing materials of a type commonly used for the extraction of metal or as a basis for the manufacture of chemical compounds, and assessed with duty thereunder at the rate of 15 per centum ad valorem.

Plaintiff claims that shipment is entitled to entry free of duty as manganese ore.

The pertinent provisions of the Tariff Schedules of the United States read as follows:

Schedule 6, Part 1:

Part 1 headnotes:
_____

1. This part covers metal-bearing ores, and certain other metal-bearing materials. * * *

    *      *      *      *      *      *      *

2. For the purposes of this part—

(a) the term "metal-bearing ores" embraces only metalliferous minerals, whether crude or concentrated (by crushing, flotation, washing, or by other physical or mechanical separation processes which do not involve substantial chemical change), and roasted or sintered lead, copper, and zinc concentrates, from which precious metals or base metals, as defined in headnote 2 of this schedule, are commercially obtained, including metals obtained directly in unalloyed form, in the form of alloys, or in the form of chemical compounds;

(b) the term *other metal-bearing materials of a type commonly used for the extraction of metal or as a basis for the manufacture of chemical compounds* embraces ash, slag, dross, scale, mattes, speiss, skimmings, flue dust, fumes, refinery slimes, residues, and all other materials (except metal-bearing ores, as above defined, and the dross or residuum from burnt pyrites) of a type from which precious metals or base metals, as defined in headnote 2 of this schedule, are commonly obtained (either as the result of a further processing of the materials as such, or as a result of the addition of the materials as alloying materials to other materials being processed), including metals obtained directly in unalloyed form, in the form of alloys, or in the form of chemical compounds; [Emphasis copied.]

Classified:

Other metal-bearing materials of a type commonly used for the extraction of metal or as a basis for the manufacture of chemical compounds:

    *      *      *      *      *      *      *

Other:

    *      *      *      *      *      *      *

603.70      Other _____ 15% ad val.

Claimed:

Metal-bearing ores and the dross or residuum from burnt pyrites:

    *      *      *      *      *      *      *

601.27      Manganese ore, including ferruginous manganese ore, and manganiferous iron ore, all the foregoing containing over 10 percent by weight of manganese_____ 0.25¢ per lb. on manganese content

911.07   Manganese   ore,   including   ferruginous
manganese ore, and manganiferous iron
ore, all the foregoing containing over 10
percent by weight of manganese (provided
for in item 601.27, part 1, schedule 6) _____          Free

Plaintiff produced three witnesses: Robert N. Johnson, product manager of the importer's Mining and Metals Division and former assistant director of its foreign operations including its overseas smelting plants; Dr. Robert A. Hard, director of the research and development programs in the importer's Mining and Metals Division; and Edgar Bell Mancke, manager of raw materials research for Bethlehem Steel Corporation.

The material at bar originated in British Guiana and Ghana where it was bought by the importer as "raw" (mined and washed) ore. The merchandise, as purchased, contained manganese dioxide ($MnO_2$), a common manganese mineral. Also present in the ore, as shown in collective exhibit 3 (characterized by the witness Hard as "typical commercial analyses which give the important ingredients in the ore"), are iron,[1] phosphorus, and oxides of silicon, aluminum, calcium and potassium.

The ore was shipped to a subsidiary of the importer in Sauda, Norway where it was screened to remove particles smaller than one-quarter inch in size, known as "fines". The particles over one-quarter inch were heated with coke in a smelting furnace to produce standard ferromanganese, an alloy of iron, manganese and iron. In this process, the manganese in the ore is reduced to a metallic state.

The fines were mixed with a "small amount" of coal or coke and "agglomerated" in a rotary kiln in a process described as follows:

> * * * The blend is passed through a rotary kiln in which oil and gas are fired. As the kiln rotates, the ore reaches a temperature at which it becomes plastic, semi-solid. The rotary action of the kiln agglomerates the semi-plastic particles of ore into nodules that are anywhere from one-half to one inch in size.

The heating removed the moisture in the form of steam, which was described by Hard as a "physical reaction". However, chemical changes also took place in the kiln. At between 2000 to 2200 degrees Fahrenheit (or "roughly" between 1100 and 1250 degrees centigrade) the manganese dioxide lost one oxygen atom and was converted to manganous oxide ($MnO$). Apparently the conversion to this oxide was not total as, according to Hard, "some of it is $Mn_3O_4$ and some of it is $Mn_2O_3$." This conversion also changed the valence state of the manganese. The oxygen atom released from the $MnO_2$ combined with

---

[1] The analyses do not show the oxygen that is combined with the manganese, iron or phosphorus. According to Hard, "it is implied rather than stated." Also, some of the lower oxides, such as $Mn_2O_3$, are present in the ore from British Guiana.

the carbon in the coke to form carbon monoxide and carbon dioxide. (The carbon, which served, in addition, as a fuel, also united with the oxygen in the kiln gas.)

The purpose of the kiln operation was "to effect a physical change, agglomerating small particles into large particles" for use in producing ferromanganese and other manganese-bearing alloys. It is not commercially practicable to use fines in the production of these alloys because, when fed directly into the electric furnace, they prevent the escape of the gases formed during reduction. This condition has resulted in explosions which demolished furnaces and caused fatalities. The nodules obtained in the Sauda plant are then used in the same manner as the larger pieces which were screened out.

There is no removal or separation of the gangue (unwanted materials) or matrix in the Sauda process. Therefore, the witness Mancke testified, because of the presence of the gangue, he would consider the nodules to be an ore, but not a concentrated ore. However, according to Hard, the nodules are a concentrated ore, or "metal-bearing concentrate", as the manganese content was upgraded by the loss of water and removal of oxygen.

It was the witnesses' opinion that the processing at Sauda did not involve a substantial chemical change because 1) the only desired change was a physical one (agglomeration of particles); 2) the chemical changes were unsought; 3) the "amount of energy required to carry the reduction from $MnO$ to manganese alloys in the electric furnace is substantially the same as if you introduced the manganese element to the furnace as $MnO_2$ in which you naturally found it in the ore" [Hard]. The reduction from $MnO_2$ to $MnO$ is a "very easy, simple operation", according to Hard, because the first oxygen atom in the compound is held "loosely", whereas the reduction from $MnO$ to $Mn$ "requires the large expensive operation that you normally associate with production of ferromanganese."

The government produced no witnesses.

Item 601.27, the manganese ore provision under which plaintiff claims classification, is governed by Headnote 2 of Schedule 6, Part 1, which provides that—

> For the purposes of this part—
> (a) the term "metal-bearing ores" embraces only metalliferous minerals, whether crude or concentrated (by crushing, flotation, washing, or by other physical or mechanical separation processes which do not involve substantial chemical change), and roasted or sintered lead, copper, and zinc concentrates, from which precious metals or base metals, as defined in headnote 2 of this schedule, are commercially obtained, including metals obtained directly in unalloyed form, in the form of alloys, or in the form of chemical compounds;

Plaintiff contends that there was no substantial chemical change in the imported nodules as the fines were not advanced chemically or metallurgically for their intended use, and none of the gangue materials had been removed in the nodularization. It also claims that the nodules are not "concentrated" within the meaning of Headnote 2, *supra*, as there was no removal or separation of the wanted material from the unwanted material, and cites *United States* v. *C. J. Tower & Sons*, 43 CCPA 49, C.A.D. 608 (1955), in support of this argument.

Defendant's position is that substantial chemical change under this definition does not depend upon whether the article contains waste material or has been advanced as a metal; and that the conversion of manganese dioxide into other manganese compounds was a substantial chemical change which removed the resultant product from consideration as a metal-bearing ore for tariff purposes.

The merchandise in the *Tower* case, *supra*, consisted of alleged zirconium ore concentrates, specifically stabilized zirconium oxide, which was classified as earthy or mineral substances wholly or partly manufactured under paragraph 214, Tariff Act of 1930, and claimed to be entitled to duty-free entry under paragraph 1719 of that act, as amended, as "minerals, crude or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for: * * * zirconium ores or concentrates". Part of the material was produced by fusing a mixture of zirconium ore (zirconium silicate), carbon and iron borings in an electric arc furnace. In the process, the zirconium silicate was broken down into zirconium oxide, called stabilized zirconia, which was the imported merchandise. Zirconium silicate, the court noted—

> * * * is a definite chemical compound, having properties which are distinct from those of either zirconium oxide or silicon dioxide. It can, however, be broken down by the action of heat alone into the two substances last mentioned, and that change takes place in the process here involved. It is properly described by the witnesses as a chemical change induced by physical means.

and set out the issue as—

> * * * whether the chemical separation, by heating, of zirconium silicate into zirconium oxide and silicon dioxide, followed by removal of the silica, so that the remaining material has a much higher percentage of zirconium oxide than the original ore, is described as a concentrating process.

It was the government's position that ore concentrating processes were limited to physical separation of ingredients only. The court agreed and, citing various definitions of "concentrate" and "ore dressing", held that a concentrate "must be the product of a process which involves no substantial chemical change."

Inherent in the *Tower* decision and the definitions cited therein was the understanding that ore concentrates are the product of a process involving the *separation* of the wanted materials from the unwanted with the discarding of the latter.[2]

Thus, a concentrate, in the tariff sense, is the product of a process whereby the desired material has been separated from a substantial portion of the unwanted constituents; and under the Tariff Schedules of the United States, such process, with respect to metal-bearing ores, must not, with certain named exceptions, involve substantial chemical changes.

The record establishes, and this is not controverted by defendant, that the processing of the fines into nodules did not involve removal of the gangue, or waste material.[3] Therefore, whether or not the Sauda process involved substantial chemical change, that treatment did not constitute a concentration; therefore, the subject merchandise is not "concentrated" within the meaning of Headnote 2(a).

The question remaining is whether the nodules are a "crude" ore within the sense of the governing headnote. We think not.

The term "ore", which is a word in common use and, unless shown to be used in the tariff statute in a technical sense or to have a differing commercial designation, is to be accorded its ordinary common meaning, *F. E. Wallace & Co.* v. *United States*, 2 Cust. Ct. 136, C.D. 108 (1939), "refers to a mineral substance in its natural state as removed from the earth." *F. B. Vandegrift & Co., Inc.* v. *United States*, 38 Cust. Ct. 187, 197, C.D. 1861 (1957).[4]

---

[2] In *Firth Sterling, Inc.* v. *United States*, 48 CCPA 130, C.A.D. 779 (1961), our court of appeals held that artificial tungsten scheelite produced by chemical means was classifiable as tungsten concentrate under paragraph 302(c), Tariff Act of 1930. The broader definition of "concentrate" applied by the court to the tungsten paragraph was not adopted by the Tariff Commission in the revised tariff schedules. Nine months earlier, the commission had published the *Tariff Classification Study*, November 15, 1960, which had included a proposed definition for metal-bearing ores in Headnote 2(a), *supra* (and subsequently adopted by Congress in the Tariff Classification Act of 1962, Pub. L. 87–456, 76 Stat. 72) that, except for roasted or sintered lead, copper, and zinc concentrates, "does not embrace materials subjected to metal separation processes which involve substantial chemical change" (*Study*, Sched. 6, p. 17).

The processing which was in issue in *Firth Sterling* involved the *removal* of unwanted matter by chemical means from crude low grade scheelite ore. Although holding that it was not bound by its decision in the *Tower* case, the appellate court recognized that ore concentration is a process whereby the strength of the desired material is increased by removing the useless matter.

[3] Except perhaps for the potassium and calcium which were apparently present in small amounts in the "raw" ore, but are unaccountably missing from chemical analyses of the imported nodules, as noted *infra*.

[4] See e.g.:
*Webster's New International Dictionary,* 2nd ed., 1956:
ore 1. A natural or native material that, usually, may be profitably mined and treated for the extraction of any of its constituents. * * *
*Funk & Wagnalls New Standard Dictionary,* 1942:
ore 1. A natural substance, sometimes forming part of a rock containing one or more metals. * * *
*Audels Mechanical Dictionary,* 1942:
ore.—The native form of a metal, whether free or uncombined; as gold, copper, etc., or combined; as, iron, lead, etc.; * * *.

However, "crude" as used in the tariff legislation is a relative term, its meaning depending upon its use in the context. *United States* v. *Nichols Copper Co.*, 29 CCPA 186, C.A.D. 190 (1941). Thus, in *Ishimitsu Co.* v. *United States*, 12 Ct. Cust. Appls. 477, 479, 480, T.D. 40672 (1925), the court, holding that nigari, a byproduct of the manufacture of salt from seawater, which was claimed dutiable as a crude mineral under paragraph 549, Tariff Act of 1913, should have been classified as waste, stated:

Crude implies that it is raw, unprepared or in its natural state.

But in *Fynaut & Popek* v. *United States*, 23 CCPA 265, 269–270, T.D. 48112 (1936), the court said:

In accordance with the foregoing, we have repeatedly held that an article may be crude in a tariff sense, although it has undergone some processes advancing the article from its natural state, provided that such processes do not fit the article for its ultimate use. In the case of *Togasaki & Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 463, T.D. 40667, this court said:

The word "crude," has been defined so many times by the courts as to require but little citation of authority here. It has been held to mean, when applied to the name of anything, that this thing, however much it may be processed, if, as a matter of fact, it must go through some additional process of substantial preparation or manufacture in order to fit it for its chief or only use, is, so far as that use is concerned, a crude article. *United States* v. *Danker & Marston* (2 Ct. Cust. Appls. 522 [524]; T.D. 32251); *United States* v. *American Chicle Co.* (10 Ct. Cust. Appls. 98; T.D. 38360); *United States* v. *Rice Co.* (9 Ct. Cust. Appls. 165; T.D. 37998. * * *

It would appear from the decided cases that the meaning of the word "crude" has been somewhat enlarged from its common meaning as found in standard dictionaries, but we have found no case where the word has been given a *narrower* meaning than its ordinary common meaning. We find nothing in said paragraph 776 to lead us to conclude that Congress intended, in its enactment, that articles named therein, when in their natural state, should not be considered to be crude.

A literal application of *Fynaut* would compel a finding that the subject nodules are not crude; the record indicates that it was not commercially feasible to use the fines in their natural state in the production of ferromanganese as they created hazardous explosive conditions in the smelting furnace. Thus, the Sauda process advanced the material by fitting it for its ultimate use. Of course, a mere physical change in an ore, which does not change the character of the original material, is not generally considered sufficient to advance it, for tariff purposes, beyond the stage of being crude or concentrated. *National Lead Co.* v. *United States*, 51 Cust. Ct. 13, C.D. 2407 (1963).

Plaintiff cites *Hampton, Jr., & Co.* v. *United States*, 6 Ct. Cust. Appls. 392, T.D. 35926 ('1915), in support of its claim that the nodules are "crude" despite the processing they were subjected to. In that case, the court held that the merchandise there involved, molybdenite, was entitled to entry free of duty as a mineral, not advanced in value or condition under paragraph 549 of the 1913 Tariff Act. Molybdenite, the court noted, is a natural mineral which, as found in nature, is mixed with rock or gangue, and obtained, as imported, by separating it from the rock formation in which found by crushing the rock, then placing the whole in water and skimming off the mineral which rose to the surface.

The court pointed out that—

> As imported it is in its natural state as reclaimed from the earth and the gangue surrounding the same. * * * The crushing process does not *per se* affect the molybdenite or change its condition or formation.

and went on to state—

> It may be generally said that it has been uniformly held in customs interpretation that the application of processes necessary to produce an article from its native condition and to bring it into a condition that it may be imported, without affecting its *per se* character, is not regarded either as a manufacturing process or as a process advancing it in value or condition. The cited cases illustrate the principle here applied, speaking in the language of the particular decision, that processes which leave the article "sifted without changing its character," as in Roessler & Hasslacher Chemical Co. (94 Fed., 822) ; and processes which are applied for no other purpose and "had no effect upon the article itself, other than to get it by itself," as in United States v. Godwin (91 Fed., 753) ; and as held in Schoenemann v. United States (119 Fed., 584), "though adding slightly to their value," do not amount to "an advance in value or condition" in a tariff sense.

We find that *Hampton* is relevant, but not for the similarity in methods employed, as plaintiff suggests; rather, it points up the distinction between obtaining the mineral *in its natural state* by a separation process, and effecting a chemical change *in* the mineral so that it is no longer the original source material but the product of a chemical reaction therein. Our court of appeals observed, in *Reichard Coulston, Inc.* v. *United States*, 34 CCPA 108, 111, C.A.D. 350 (1946), in describing the processes used in *Hampton* and distinguishing it from that employed in obtaining the merchandise involved therein—

> The molybdenite, as such, was in *the same condition as found in nature* and was merely separated from the gangue. The molybdenite was merely gotten by itself and was *as crude as though it*

*had been so mined.* In the instant case it has not been shown that the imported merchandise exists by itself with the other oxides and the alumina content in a conglomerate mass, and the process resulting in its production is not merely a matter of mechanical separation of gangue from sought metal-bearing ore. Here the bauxite was subjected to chemical reaction as hereinbefore set out. Therefore, the decision in the *Hampton* case, *supra*, does not support appellant's contention.

Similarly, *Hampton* does not support plaintiff's claim herein, as the Sauda process affected the *per se* character of the original material. The manganese ore as found in nature and purchased by plaintiff contained pyrolusite, that is, manganese dioxide ($MnO_2$), which was converted in the kiln to manganous oxide ($MnO$), manganese sesquioxide ($Mn_2O_3$) and hausmannite ($Mn_3O_4$), all of which vary in formula weight, crystalline structure and in their physical and chemical properties.[5]

It is an inescapable conclusion that the mineral no longer exists as found in its natural state and that a change of this kind is not unsubstantial.

The nature of "substantial chemical change" was considered in *F. B. Vandegrift & Co., Inc.* v. *United States, supra,* which involved manganese material classified under paragraph 50, Tariff Act of 1930, as modified, as a manganese compound, and claimed dutiable under paragraph 302(a) of that act as a manganese ore or concentrate. The shipment has been produced from a manganese dioxide ore which was crushed, ground, screened, then heated to over 600 degrees centigrade, at which point a chemical reaction took place. The manganese dioxide in the ore was converted to manganese sesquioxide, $Mn_2O_3$, which, in turn, was treated with sulphuric acid. This resulted in a second chemical reaction, the conversion of $Mn_2O_3$ to $MnO_2$, described by a witness as an "activated" manganese dioxide, which "is several steps removed from the ore as found in nature."

Plaintiff's witness had testified, the court noted, that the ore was roasted in order to obtain $Mn_2O_3$ as it contained $MnO$ which is soluble in sulphuric acid whereas manganese dioxide is insoluble therein. Overruling the protest, the court stressed the first chemical reaction that took place, the conversion of $MnO_2$ to $Mn_2O_3$. Citing *United States* v. *C. J. Tower & Sons, supra,* the court stated that the testimony indicated that—

> * * * when the raw product, or ore, was subjected to the Jacobi process, a substantial chemical change did occur and that the involved product resulting from the treatment of the raw African Gold Coast manganese ore was a new chemical compound, a manganese compound.

---

[5] Raymond E. Kirk & Donald F. Othmer, *Encyclopedia of Chemical Technology,* Vol. 8, pp. 744–746; the *Condensed Chemical Dictionary,* Fifth Ed., 1956, pp. 547, 680–683, 922.

The treatment of the crude British Guiana and Ghana manganese ore herein, although involving only one chemical reaction in the manganese compound, also resulted in new chemical compounds, thus affecting the *per se* character of the original material.

We also note that the chemical reaction in the manganese dioxide was the prinicpal, but apparently not the only chemical change occurring in the ore. The chemical analyses (exhibit 3) of "typical" British Guiana and Ghana ores show the presence of oxides of calcium (CaO) and potassium ($K_2O$); but the certificates of analyses and weight accompanying the official entry papers herein do not list either element as present in the subject merchandise. It is not unreasonable to consider that they were removed from the resultant product by some chemical change which took place in the kiln.

For the foregoing reasons we find that the subject nodules are not a crude ore within the ambit of Headnote 2(a), *supra*. Plaintiff has failed to establish error in the presumptively correct classification and the correctness of its claim.

The protest is overruled. Judgment will be entered accordingly.